UNITED STATES, Plaintiff–Appellant,

v.

HITACHI AMERICA, LTD.,
Defendant/Cross–
Appellant,

and

Hitachi, Ltd., Defendant/Cross–
Appellant.

No. 97–1431, 97–1447 and 97–1452.

United States Court of Appeals,
Federal Circuit.

March 25, 1999.

Rehearing and Rehearing En Banc
Denied June 29, 1999.

James W. Poirier, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Plaintiff–Appellant. With him on the brief was David M. Cohen, Director.

John R. Wing, Weil, Gotshal & Manges LLP, of New York, New York, argued for Defendant/Cross–Appellant Hitachi America, Ltd. With him on the brief was Yoav M. Griver. Of counsel was Stuart M. Rosen.

William A. Streff, Jr., Kirkland & Ellis, of Chicago, Illinois, argued for Defendant/Cross–Appellant Hitachi, Ltd. With him on the brief were David G. Norrell, Eugene F. Assaf and Paul F. Brinkman of Washington, DC.

Before MICHEL, LOURIE, and GAJARSA, Circuit Judges.

MICHEL, Circuit Judge.

In this customs duties case, the United States, Hitachi America, Ltd. ("HAL") and its parent, Hitachi, Ltd. ("Hitachi Japan") each appeals from a portion of the judgment of the United States Court of International Trade in *United States v. Hitachi America, Ltd.,* 964 F.Supp. 344 (CIT 1997). The government brought an enforcement action against HAL and Hitachi Japan pursuant to 19 U.S.C. § 1592[1] to recover penalties and additional duties stemming from HAL's alleged violations of reporting statutes governing importers and the United States Customs Service ("Customs"). After a lengthy trial, the Court of International Trade found HAL liable for negligent violations of those statutes, which finding HAL does not here contest. HAL concedes it failed to disclose or inaccurately disclosed certain required information and supporting documentation. The government appeals the court's grant of HAL's motion to dismiss the government's complaint as to its alternative counts of reporting violations by fraud and gross negligence, which would have authorized far higher penalties than mere negligent non-reporting or false reporting. HAL cross-appeals the amount of the penalty the Court of International Trade imposed (twice the duty due on the unreported amounts) as based on the wrong valuation of the importation, namely, the domestic, retail re-sale price instead of the international, import sales price as required by statute. In addition to holding HAL liable for negligent false reporting, the Court of International Trade also held Hitachi Japan separately and fully liable for the same penalty for aiding or abetting HAL's negligent violations. Hitachi Japan cross-appeals this aspect of the

---

1. All citations to federal statutes and regulations refer to the provisions in force during the period of importations in this case or other applicable time period.

judgment of the Court of International Trade on the ground that aiding or abetting requires intent which, it is clear, was not shown here. The appeal and the two cross-appeals were submitted for our decision following oral argument on January 4, 1999.

On the government's appeal, we affirm the dismissal of the fraud and gross negligence claims as based on the finding, not shown to be clearly erroneous, that the requisite state of mind had not been proven by clear and convincing evidence. On the cross-appeals, we vacate the amount of the penalty assessed against HAL as based on the wrong sales transaction, reverse as legally incorrect the determination of liability of Hitachi Japan for aiding or abetting negligent false reporting and remand the case for a re-determination of the penalty to be imposed against HAL consistent with this opinion.

## BACKGROUND

In the transactions at issue, Hitachi Japan manufactured subway cars in Japan, which were imported into the United States pursuant to a contract its subsidiary HAL had with the Metropolitan Atlanta Rapid Transit Authority ("MARTA"). Hitachi Japan also enlisted the help of C. Itoh & Co., Ltd. (Japan) ("CIJ"), a Japanese trading company, to assist in contract negotiations and logistics. In addition, a joint venture was formed between HAL and C. Itoh & Co. (America) ("CIA") to import the merchandise. HAL alone was the importer of record while CIA acted primarily as a banker. In general, the payments flowed from MARTA to the HAL/CIA joint venture domestically, to CIJ internationally, and then to Hitachi Japan within Japan. A total of 120 subway cars were imported through forty-two customs entries between June 16, 1984 and June 29, 1988.[2]

At issue is the customs reporting treatment of certain payments made by MAR-TA based on two price adjustment clauses in the contract, the first known as "Economic Price Adjustment" ("EPA") and the second as "Monetary Value Adjustment" ("MVA"). Payments under these clauses were in addition to payments towards the base price due for the subway cars. EPA was designed to allow MARTA to assume the risk (for better or worse) of price changes on labor and materials, while MVA allowed MARTA to assume the risk (for better or worse) of changes in the yen/dollar exchange rate. Both of these contingent price adjustment clauses were pegged to published indices and progress milestones that would be fully known only after all importations were completed. EPA and MVA payments are sometimes referred to by the parties as "escalation payments," because in the time frame at issue here, the total price paid by MARTA increased under both clauses. The EPA and MVA clauses were expressly set forth in the publicized and publicly available contract between MARTA and HAL/CIA, the contract being termed "CQ-311."

HAL/CIA paid Hitachi Japan, via CIJ, almost $63 million for the subway cars, but HAL declared only $40 million to Customs. The nearly $23 million gap consisted of EPA and MVA payments that were not declared to Customs at the time of the respective entries or soon thereafter, with the MVA payments making up about $20 million of the unreported payments and the EPA payments about $3 million.

In April 1984, before the first importations began, officials from HAL and Hitachi Japan met with representatives from Customs to discuss the MARTA project. Although it is the normal practice for Customs officials to request copies of the underlying contract and to inquire into escalation provisions, there is no record of whether they did so at the meeting. Moreover, at the 1996 trial the HAL and Hitachi Japan officials who were at the

---

**2.** Although there were forty-two entries, the government only filed suit with respect to forty-one of the entries.

meeting could not recall what was discussed twelve years earlier. After the meeting, HAL decided not to report the escalation clauses on contemporaneous import entry documents, apparently under the assumption that the additional duties arising from the payments under the clauses could be reported and the derivative additional duties paid at the end of the project. Although not referring to the escalation clauses, the entry documents referred to CQ–311 ninety-two times but neither the contract nor the text of the escalation clauses was attached. At this point, HAL knew that EPA was dutiable, but was unsure whether MVA was dutiable at all, even at a later date.[3]

Throughout the four-year period of the forty-one importations, HAL made efforts to discover whether MVA was dutiable and how to calculate the additional duties it would eventually owe to Customs under the EPA and perhaps the MVA clauses. In Spring 1988, shortly before the final entries, HAL engaged outside counsel to determine whether MVA was dutiable. Outside counsel advised HAL not to pay either EPA or MVA duties until the exact amount of "potentially reportable" MVA duties were known. In addition, HAL had difficulty making the calculations because its joint venture partner, CIA, refused to turn over documents necessary to determine the appropriate amount of MVA payments. HAL claims that it was in the process of determining how much it owed when Customs officers executed a criminal search warrant for documents related to suspected customs fraud in April 1989, some nine months after the last entry.

A grand jury declined to indict on charges of criminal fraud. In December 1990, the government estimated the lost duties to be $851,455 based on the EPA and MVA payments made by MARTA to the HAL/CIA joint venture. After a supplementary audit in 1994, the government added another $96,399 in duties, bringing the total to $947,854.[4] Later, during the civil trial, the government proposed another amount of lost duties, $632,102, based on payments in yen from HAL/CIA to CIJ. However, the government contended below, as it does here, that the higher $947,854 figure is the correct amount that should be used.

The government filed suit in the Court of International Trade on June 29, 1993. After substantial discovery was taken, trial began on May 7, 1996 and lasted nearly six full weeks. The government submitted sixty-eight binders of pre-trial exhibits and called eighteen witnesses. HAL and Hitachi Japan moved to dismiss the complaint after the close of the government's case-in-chief. Their motion was granted on the counts alleging fraudulent and grossly negligent false reporting, but denied on the count of negligent false reporting. HAL and Hitachi Japan elected not to put on a case, and HAL was found liable on the count alleging negligence, while Hitachi Japan, not the importer of record, was found liable solely for aiding or abetting HAL's negligence.

At trial, the government alleged that four material and false statements were made on the entry documents:

(1) the price reported on entry documents did not include EPA clauses reflecting payments that would be made thereunder, violating 19 U.S.C. § 1484;[5]

---

3. Some at HAL questioned whether MVA was dutiable because yen was being received by CIJ and Hitachi Japan and MVA, being related only to dollar transactions, had no impact on the amount in yen it received.

4. In 1991, HAL paid $851,385 in response to a Pre–Penalty Notice issued by Customs. Thus, the remaining amount of lost duties the government now seeks is $96,469. The amount of the penalty the government seeks for negligence is two times the total amount of duties owed, $1,895,708.

5. Section 1484(a) requires an importer to provide sufficient documentation to Customs so that it can determine the duty owed, based on an accurate price for the goods. The government alleges that Customs had to be made aware of the EPA and MVA clauses at the time of importation in order for the price on the entry documents to be accurate.

(2) the price reported on entry documents did not include MVA clauses reflecting payments that would be made thereunder, violating 19 U.S.C. § 1484;

(3) the price was declared in dollars, instead of yen, violating 19 U.S.C. § 1481 (requiring the currency of payment to be reported on entry documents); and

(4) the sworn statements on the entry documents that HAL did not know of any document indicating that the declared price was inaccurate, and that HAL would disclose any such document to Customs "at once," were not truthful when filed, violating 19 U.S.C. § 1485.[6]

The government alleged that all of the statements were made negligently, and in the alternative argued that the first, second, and fourth statements were made fraudulently or with gross negligence. The Court of International Trade held that HAL was not liable under any theory for the first two statements but was negligent in making the last two statements.

The Court of International Trade concluded, however, that it could not penalize HAL for failing to include EPA clauses on the entry documents because to do so would violate the Due Process Clause because of the lack of notice of such a requirement in the applicable statutes, regulations, and Customs rulings. *See Hitachi Am.,* 964 F.Supp. at 360–61.[7] With respect to the MVA clause, the Court of International Trade reasoned that it was not relevant for proper appraisal of imported merchandise because the payments were not dutiable as made domestically by MARTA to HAL/CIA in dollars, while the merchandise as imported from Japan was paid for in yen to CIJ by the HAL/CIA joint venture. This absolved HAL from liability for failing to report the MVA clause on entry documents and for failing

to notify Customs at once that the clause and associated payments rendered the price on the entry documents inaccurate. The Court of International Trade, however, did hold HAL liable for negligently declaring the value of the transaction in dollars, rather than yen. Neither HAL nor Hitachi Japan appeals that aspect of the judgment. Finally, the Court of International Trade found HAL liable for negligently failing to notify Customs "at once" of the existence of the EPA clause and the payments HAL was receiving pursuant to that clause.

After finding liability, the Court of International Trade penalized HAL $1,545,-970, the maximum allowed for negligent false reporting on the facts of this case. The penalty was calculated by using the government's assessment of the amount of additional duty owed based on the total domestic payments made by MARTA, including the EPA and MVA escalations (bringing the total to $947,854), reducing that amount to exclude the first twenty-one entries as barred by the statute of limitations, and doubling the amount of lost duties. *See* 19 U.S.C. § 1592(c)(3)(A) (allowing a maximum penalty of two times the amount of lost duties); 19 U.S.C. § 1621 (setting forth a five-year statute of limitations for negligence actions). Hitachi Japan was also found jointly and severally liable for that amount as an aider or abettor. *See id.* § 1592(a)(1)(B); *Hitachi Am.,* 964 F.Supp. at 377–79.

On its appeal, the government challenges the conclusion of the Court of International Trade that no liability attached to HAL's failure to disclose EPA and MVA clauses on the entry documents. This challenge would affect the basis for liability, but not the amount of the penalty, if

---

**6.** Section 1485(a)(2) requires the importer to file an oath declaring that the prices in the entry documents are true, and section 1485(a)(4) requires the importer to produce "at once" any documents or information showing that the declared price is not true or correct.

**7.** Although HAL was not found liable for failing to include the EPA clause on entry documents, it was still found liable for failing to disclose the EPA payments under the clause "at once" when it became aware that the price on the entry documents was not entirely accurate due to the payments it was receiving. *See Hitachi Am.,* 964 F.Supp. at 368–69.

HAL was merely found negligent for failing to disclose the clauses on the entry documents. The government also argues that the Court of International Trade erred by finding HAL's false or incomplete reporting merely negligent, as opposed to fraudulent or grossly negligent, when it failed to disclose the existence of the payments made pursuant to the two clauses "at once." The government further appeals the Court of International Trade's refusal to enforce HAL's written waiver of the five-year statute of limitations with respect to the twenty-one entries as to which the statute of limitations had already expired before the waiver was executed. These latter two contentions would affect the amount of the penalty greatly.

In its cross-appeal, HAL asserts that the Court of International Trade erred in relying on the wrong sales transaction in determining the amount of lost duties and hence the negligence penalty owed by HAL. Hitachi Japan, in its cross-appeal, asserts that the Court of International Trade erred as a matter of law in ruling that it can be liable under the Customs penalty statute for unintentionally, but negligently, "aiding or abetting" HAL's negligent false reporting.

We will address the government's appeal first, and then turn to HAL's and Hitachi Japan's cross-appeals, respectively.

## DISCUSSION

### I.

 Legal determinations made by the Court of International Trade are reviewed here *de novo*, while its factual findings are reviewed for clear error. *See NEC Elecs., Inc. v. United States,* 144 F.3d 788, 790 (Fed.Cir.1998). Questions of fraudulent non-reporting or misreporting, or of gross negligence, each involving a type of intent, are questions of fact. *See Allen Organ Co. v. Kimball Int'l, Inc.,* 839 F.2d 1556, 1567 (Fed.Cir.1988) ("Intent is a factual determination particularly within the province

of the trier of fact."). Questions of valuation in this customs case turn on construction of a phrase in the statute, a question of law and, hence, are questions of law. The requirements of aiding or abetting negligent violations of the customs reporting statutes are likewise questions of law because they turn on construction of the statute and application of basic legal doctrine. We have subject matter jurisdiction under 28 U.S.C. § 1295(a)(5) (1994), and the appeal was timely filed.

### II.

### A. *Fraud*

HAL was found in violation of the statute for negligently failing to notify Customs promptly that the price reported on the forty-one entry documents was not accurate due to the failure to include the EPA clause on the entry documents, which would have signaled to Customs that HAL was receiving payments pursuant to the EPA clause.[8] *See* 19 U.S.C. § 1485(a)(4) (requiring an importer to "produce at once" any documents or information showing that any prices on the entry documents are not true or correct). None of the parties dispute that HAL was at least negligent in this respect. But the government contends that HAL acted fraudulently or, in the alternative, was grossly negligent in violating the reporting laws. The test for fraud applied by the Court of International Trade is whether HAL "knowingly" entered goods by means of a material false statement. *Hitachi Am.,* 964 F.Supp. at 371. The government bore the burden of proving fraudulent intent by clear and convincing evidence. *See* 19 U.S.C. § 1592(e)(2).

The government equates the "knowingly" standard with actual notice, and argues that HAL had actual notice of its duty either (1) as promptly as feasible to declare EPA payments as well as the base

---

**8.** Because the Court of International Trade found the MVA clause and payments thereunder irrelevant, only the EPA clause and payments were addressed by the Court of International Trade in its discussion of HAL's liability.

price and immediately to disclose related contract and payment documents; or (2) to ask Customs to hold open liquidation,[9] or (3) make advance deposits of estimated duties that included estimated EPA payments. But according to the government, HAL chose to ignore all three of these alternative requirements. The government argues that the two HAL employees successively responsible for the MARTA project, Mr. Toda and Mr. Taga, had actual notice of these three alternative reporting requirements from their prior experience and from memoranda written to them by lower-level employees. One of the employees, Ms. Crecco, wrote a memorandum in response to a request from Mr. Toda seeking a recommendation of how to declare escalation payments on entry documents when they could not be ascertained until after all the importations were complete. Ms. Crecco's memorandum recommended that Mr. Toda should either arrange for suspended liquidation or deposit estimated duties based on estimated escalations. The Court of International Trade, however, found merely that "Ms. Crecco's memo is evidence that Mr. Toda should have looked further into the matter, but it does not serve to invest him with actual knowledge." *Hitachi Am.*, 964 F.Supp. at 374. The Court of International Trade applied the same reasoning to a later memorandum from Ms. Hansen, a subordinate of Mr. Taga, who succeeded Mr. Toda. Hansen's memorandum recommended advising Customs of the escalation clauses and suspending liquidation. The government contends that the Court of International Trade applied the wrong legal standard when it, according to the government, held, as a matter of law, that advice from laypersons such as Ms. Crecco and Ms. Hansen is insufficient to invest a manager with actual knowledge of a statutory requirement. The government, on the other hand, argues that HAL had actual notice of the reporting requirements and chose to ignore them, thereby "knowingly"

entering goods by means of a material false statement.

HAL disagrees with the standard of review urged by the government. HAL argues that the government improperly attempts to obtain *de novo* review by characterizing the Court of International Trade's finding on this issue of intent as based on a mistaken legal distinction between the advice of a customs lawyer or expert and the advice of a layperson. But HAL argues that the Court of International Trade merely weighed the non-lawyer memoranda along with the circumstances surrounding their creation and the testimony of all the witnesses and concluded that the memoranda did not provide clear and convincing evidence that HAL knew it was violating the law by omitting EPA and MVA payment amounts and documents. HAL stresses that the Court of International Trade's findings on intent rested on extensive findings of subsidiary facts and credibility determinations about the many witnesses at a six-week trial as set forth in a carefully written ninety-two page opinion. HAL argues that, given that the court's findings were amply supported by the record evidence, they cannot be said to be clearly erroneous. Throughout the period of importation, according to HAL, it was under the good faith belief that it could report the escalation payments and documents at some point after the importations concluded when the additional amount of duties it owed had been determined because only then could the escalation payments finally be calculated. To support this claim, HAL points both to evidence that it had previously used this procedure without any negative consequences and that throughout the importation period it was actively working on ways to respond to the reporting dilemma and trying to determine how much more it owed. Finally, HAL points out that the details of the EPA and MVA

---

9. "Liquidation" refers to the process by which the declared value and duty assessment become final. *See* 19 U.S.C. § 1503. Liqui-

dation occurs automatically one year after an entry, unless the entry is held open by Customs. *See* 19 U.S.C. § 1504(a).

clauses were publicly disclosed by MAR-TA and that the contract document was cited in declarations to Customs ninety-two times—hardly acts that would lead a trier of fact to believe that HAL fraudulently intended not to report these payments.

In reviewing the Court of International Trade's decision on this issue, we apply a clearly erroneous standard of review, for it concerns intent, which is a factual determination as to state of mind. As stated above, the government characterizes a portion of the Court of International Trade's opinion as holding, as a matter of law, that a layperson cannot invest a superior with the knowledge of a legal filing requirement necessary to support a fraud claim. However, we conclude that the Court of International Trade did not so hold. When discussing the effect of the memorandum from Ms. Crecco, for example, the Court of International Trade merely found that, on the facts in this case, her advice did not amount to an authoritative interpretation of law, and therefore did not invest Mr. Toda with actual knowledge that HAL was violating customs laws. *See Hitachi Am.,* 964 F.Supp. at 374. HAL does not contend, and the Court of International Trade did not hold, that in no set of circumstances could a memorandum from a layperson invest a superior with knowledge of a legal requirement to report. Instead, the Court of International Trade's decision was based on a fair consideration of its many factual determinations, which included the memorandum, the surrounding circumstances, past practices, and assessments of the credibility of various witnesses. Despite the government's attempt to reframe this issue as one of law, a clearly erroneous standard of review applies, as the issue concerns a finding of fact as to intent on a full evidentiary record.

■ Examining the record relied on by the Court of International Trade, there appears to be a wealth of support for the conclusion that the government did not meet its burden of showing by clear and convincing evidence that HAL fraudulently violated customs laws. There are several facts that tend to negate the government's assertion that HAL intended to keep Customs uninformed as to the existence and effects of the escalation clauses. For example, the contract that contained the escalation clauses, CQ–311, was publicly available, disclosed by MARTA in a press release, and cited ninety-two times by HAL to Customs officials. Moreover, Customs was aware that EPA and MVA clauses are commonly used in such import transactions.

■ The Court of International Trade also relied on numerous credibility determinations. There was much testimony from HAL and Hitachi Japan officials to the effect that they believed escalation payments could be paid after an entire series of importations were completed without any penalty, and that they had done so on previous projects. The credibility of the testimony of Ms. Crecco, who wrote the memorandum the government so heavily relies on, was impeached by her other conduct, according to the Court of International Trade. This credibility determination is amply supported by the record. First, Ms. Crecco offered her services to Customs as a paid government informant.[10] Second, while Ms. Crecco's principal argument was that HAL never intended to report the escalation payments and related duties owed to Customs, she herself was in charge of Customs compliance and told Ms. Hansen that HAL should not pay duty on EPA until the dutiability of MVA was established. Finally, after agreeing to become an informant, Ms. Crecco became aware that Hitachi Japan was eager to settle the issues arising from the escalation clauses and that outside counsel was being consulted

---

10. Although she knew that she had to pay taxes on the money she earned as an informant, she admitted on cross-examination in her deposition that she did not report those earnings and pay the associated taxes.

by HAL to determine what to do about the matter. Rather than help HAL to comply with customs reporting laws, she stalled its efforts by sending a letter to outside counsel omitting crucial entries that outside counsel needed to determine the amount of duty owed. Moreover, Ms. Crecco was not an attorney and had only recently been promoted to the customs compliance position. Based on all this evidence, we cannot overturn, as clearly erroneous, the Court of International Trade's eminently reasonable credibility determinations as to Ms. Crecco or the other witnesses.

The Court of International Trade also had other facts before it that tended to show that HAL and Hitachi Japan were conducting ongoing efforts to determine how much more they owed and were planning to pay the additional duties associated with the escalation clauses when they were able to determine the exact amount. For instance, a fund was set aside by Hitachi Japan to pay for the additional duties and outside counsel was hired by HAL for advice. Even outside counsel advised not to pay the EPA- or MVA-related duties until the MVA reportability issue was resolved and the amount of duties determined. And when Ms. Crecco surreptitiously recorded a conversation with Ms. Hansen in the hopes of obtaining incriminating information, Ms. Hansen informed Ms. Crecco that Hitachi Japan "was ready to pay." It appears that HAL truly believed that it could report the escalation payments at a later date than when the entry documents were filed, for only then could they be calculated accurately. This was, we agree, an unreasonable belief, properly resulting in a finding of negligent false reporting. But we hold that under the facts of this case the Court of International Trade did not clearly err when it found that HAL's acts had not been proven to constitute fraudulent reporting of materially false information on the entry documents. Essentially, the Court of International Trade found the government had failed to sustain its elevated burden of proof at trial of clear and convincing evidence.

## B. Gross Negligence

In a separate, alternative count in its complaint, the government alleged that the conduct of HAL was grossly negligent because its employees' acts were in reckless disregard of customs laws of which they were well aware. For largely the same reasons as the Court of International Trade declined to find fraud, it also found that HAL was not shown to have been grossly negligent in failing to report at once estimated EPA payments and related documents. A finding of gross negligence would require a willful, wanton, or reckless disregard in HAL's failure to ascertain both the relevant facts and the statutory obligation to report EPA payments. According to the Court of International Trade:

The documents in evidence display an initial belief by Hitachi officials that it was permissible to pay aggregate EPA duty at the end of a long term project. All of the Hitachi officials who testified at trial asserted their belief that it was permissible. Although the testimony was self-serving, the Court gives it some weight. Disregarded advice from lay employees does not entail recklessness, though disregarded advice from experts or legal counsel might satisfy the test. In fact, however, when defendants' [sic] consulted legal counsel, they were advised *NOT* to pay until final amounts were ascertained. Government counsel frequently erupted into testimony that it is common knowledge in the import community that importers may not privately run a tally on EPA and announce with impunity the aggregate duty at the end, but the government failed to call a *single* Import Specialist to testify to that common knowledge. The duty to pay at once on EPA receipts absent suspended liquidation or the deposit of estimated duties, while undeniably extant, apparently is not blatant. If it were, the Court would have seen an expert within the customs community testify on the government's behalf.

*Hitachi Am.*, 964 F.Supp. at 374–75 (emphasis in original). We agree with the Court of International Trade's reasoning and refuse to disturb its credibility determination that HAL and Hitachi Japan officials believed in good faith that EPA payments and clauses could be reported and associated additional duties paid after all of the importations had occurred. Perhaps most telling is that outside counsel was consulted, and came to the same conclusion after an independent review of the relevant customs laws. We agree with the Court of International Trade that such conduct did not amount to reckless disregard of the customs laws. At the very least, we cannot say that the Court of International Trade clearly erred in failing to find that gross negligence was proven by clear and convincing evidence.

### C. Due Process

The Court of International Trade declined to penalize HAL for even negligently failing to include the EPA clause on the entry documents. *See* 19 U.S.C. § 1484; *see also supra,* note 5 (more on § 1484), note 8 (MVA clause not at issue because deemed irrelevant). The Court of International Trade, however, did not hold that HAL was free to withhold such information despite the government's suggestion that it did. Instead, it held that it would be unconstitutional to penalize HAL for failing to disclose EPA clauses on entry documents because there was inadequate notice of the requirement to do so in the statute and corresponding Customs regulations and decisions. Of particular importance was a Customs Decision published just before the importations here began that, in the trial court's words, "rendered turbid" the duty to report escalation clauses. *Hitachi Am.*, 964 F.Supp. at 360. That Decision took the position that disclosure of these clauses upon entry was merely *preferable,* rather than mandatory:

> [I]f the manufacturer and importer have agreed upon a formula under which to arrive at the price actually paid or payable, the importer should so advise the

appropriate Customs officer, *preferably* at the time of entry.

18 Cust. B. & Dec. 1030, 1032 (1984) (emphasis added). This language suggests that the importer may advise Customs later than the date of the entry or entries. The Court of International Trade refused to enforce such an indefinite reporting requirement because to do so, it held, would violate the Due Process Clause due to the vagueness of the statute and the misleading verbiage in the Customs Decision. *See Hitachi Am.*, 964 F.Supp. at 361.

■ The government first contends that HAL has no standing to assert such an argument because there was no evidence that HAL ever saw the Customs Decision at issue, much less relied on it. The government also argues that there was no evidence that anyone else was confused or misled by the Customs Decision. In addition, the government contends that HAL had notice of its duty to declare the escalation payments, because section 1484 plainly requires an importer to report the price accurately so that the duty can be properly calculated.

HAL asserts that it does indeed have standing to challenge the adequacy of the notice at issue here because a defendant need not show reliance or actual confusion before raising a Due Process defense of failure of clear notice when the defense depends on statutes and regulations of which it is presumed to be aware. HAL contends that neither the statute nor the regulation clearly requires immediate disclosure of information concerning the EPA clause. HAL also alleges that it was common practice not to disclose such information until after all of the importations were complete, especially in a long-term project such as the MARTA project. Finally, the issue itself is moot, according to HAL, because the government already obtained the largest possible negligence penalty allowed by law: twice the foregone duties. Thus, HAL argues that the government has already obtained all the relief it seeks.

■ The government's standing argument and HAL's mootness argument are both rejected as without merit. We hold that HAL has standing to contest the enforceability of any requirement to disclose EPA payments on entry documents because it has an immediate, personal and monetary stake in the outcome of the issue. *See Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 2317, 138 L.Ed.2d 849 (1997) (stating that standing requires "a 'personal stake' in the alleged dispute"). HAL clearly has such a stake in the outcome of this issue—the basis and amount of the penalty it owes to the government. The government also has a continuing interest in this issue, which supports its claim that the issue is not moot. Although the government has successfully obtained the maximum negligence penalty of about $1.5 million against HAL and Hitachi Japan, it seeks an increased fraud penalty. Under the penalty provision for fraud, the government, as it may, sought the full value of the imported merchandise, $63 million. *See* 19 U.S.C. § 1592(c)(1). Therefore, if we reversed the Court of International Trade and held that the Due Process Clause does not preclude levying a penalty for failing to report EPA clauses, then the government might be able to obtain additional penalties on remand far in excess of the amount of penalty it has obtained for the negligent violations of customs laws. On remand, the government could assert that HAL was grossly negligent or fraudulent in failing to report EPA clauses on the entry documents.[11] Thus, we conclude that HAL does have standing to assert that the reporting requirements are not sufficiently clear and that the issue is not moot.

■ The government has failed to cite to any statute or regulation that expressly requires an importer to report the existence of EPA clauses on entry documents. It relies primarily on 19 U.S.C. § 1484, which merely requires the importer to re-

port the price accurately so that the duty is properly calculated. However, it is not clear under section 1484 whether an EPA clause, which represents payments that are not definitively known at the time of importation, must be referred to at that time in order to disclose the price accurately. After all, the statute never even mentions escalation clauses or what should be done about payments that cannot be precisely known at the time of importation. To the extent section 1484 can be read to imply such a requirement, that reading is undercut by the Customs Decision stating that such disclosure on importation is merely preferable. *See* 18 Cust. B. & Dec. 1030, 1032. Indeed, only the Decision squarely addresses the situation at hand and it points away from a duty of immediate disclosure. The government had the opportunity to show that it was well known in the trade that escalation clauses had to be reported upon importation, but it failed to call any Customs officials or other witness to establish such general knowledge. Therefore, we hold the Court of International Trade properly refused to penalize HAL for failing to disclose the EPA clause on entry documents, because to do so would result in a violation of HAL's right to Due Process.

*D. Relevancy of MVA Payments to the Yen Sale for Importation*

■ The Court of International Trade concluded that "MVA payments were irrelevant for duty purposes" and therefore HAL could not be held liable, even for negligence, for either failing to disclose the MVA clause on the entry documents or for failing to notify Customs "at once" that it was receiving payments pursuant to the clause. *Hitachi Am.,* 964 F.Supp. at 359. In this transaction, MARTA paid the HAL/CIA joint venture a base price plus later payments related to the EPA and MVA clauses, all in dollars. The EPA payments were necessary because of infla-

---

11. Although a negligence action was also barred by the Court of International Trade's Due Process holding, the government could

not assert negligence on remand if we reversed because it has already recovered fully for HAL's negligence.

tion of labor and material costs during the period of importation. The MVA payments were necessary because the dollar depreciated relative to yen during the period of importation. MARTA agreed to assume these risks by including the clauses in the CQ–311 contract when it requested bids. By allocating this risk to MARTA, HAL/CIA guaranteed itself enough dollars through the base price and MVA payments to pay CIJ a fixed amount of yen. MARTA was required to pay extra dollars to the joint venture to make up for the depreciation of the dollar, but, according to the Court of International Trade, "MVA had no impact on the amount of yen received by CIJ or Hitachi Japan." *Id.* at 353.

Although CIA, the banking arm of the joint venture, paid CIJ in yen, HAL reported the value of the merchandise in dollars on entry documents. The Court of International Trade held that, because the CIA paid CIJ in yen, the importation should have been reported as a yen transaction, and HAL negligently reported it in dollars. *See id.* at 359. This holding is not appealed by any of the parties. The amount of yen paid by CIA to CIJ is used to calculate the duty, which is a percentage of the amount paid or payable for goods as imported. *See* 19 U.S.C. § 1401a(b)(1) (1994). The Court of International Trade relied on the fact that the relevant transaction for computing duty was a "yen transaction" when it concluded that the purely domestic MVA payments made by MARTA in dollars were "irrelevant" because dollar payments made by MARTA did not affect the amount of yen sent to CIJ. *See Hitachi Am.,* 964 F.Supp. at 359.

The government argues that the MVA payment from MARTA to the HAL/CIA joint venture is not the issue, but instead it is the "identical" MVA payment from CIA to CIJ that was not declared and resulted in a false statement of price. The government contends that the difference between the contractual obligation to pay in dollars

and the actual practice of paying in yen does not affect liability based on a failure to disclose MVA payments. The Court of International Trade incorrectly assumed, according to the government, that if HAL had declared in yen instead of dollars, there would have been no false statement omitting MVA. The government asserts that HAL would have used an improper exchange rate if it had declared in yen, or might have omitted the MVA payments altogether.[12]

HAL argues that there is no reason to find it liable for failing to disclose MVA payments just because it was found liable for not properly reporting the transaction in yen. Those domestic MVA payments in dollars are irrelevant to the yen transaction, according to HAL, because they had no impact on the amount of yen sent to Japan.

We agree that the domestic MVA payments made in dollars by MARTA to the HAL/CIA joint venture are irrelevant to the transaction at issue—the yen paid by the joint venture to CIJ in Japan. Under 19 U.S.C. § 1401a(b)(1), the dutiable value of the goods in question is based on the "transaction value of imported merchandise," which in turn is defined as "the price actually paid or payable for the merchandise when sold for exportation to the United States." It is undisputed that the imported merchandise was paid for in yen, and that HAL was negligent in reporting the transaction in dollars. The undisclosed MARTA MVA payments were made in dollars domestically, and under the terms of the statute have nothing to do with the "transaction value of imported merchandise" which is between other parties as well as measured in yen.

The government's central argument appears to be that the Court of International Trade should not have assumed that the correct amount of MVA would have been

**12.** It is not immediately clear how HAL would omit dollar MVA payments from a fixed amount of yen sent to CIJ, but we take this argument to mean that HAL might have

reduced the amount of yen declared to Customs by an amount corresponding to the dollars it was receiving as MVA payments from MARTA.

declared had HAL correctly declared the transaction in yen. However, there does not appear to be any reason to assume that HAL would have *incorrectly* declared the yen transaction. CIJ expected a certain amount of yen from the joint venture, and, because the dollar depreciated during the period of importation, MARTA had to make additional payments to the joint venture in dollars (the MVA payments) to make up for this depreciation. These MVA payments, made in dollars to make up for depreciation of the dollars used in the base price payment, were not part of the yen transaction. The yen transaction did not have a component of dollars that made up for the depreciated dollar relative to the yen because the currency was already converted to yen when the fixed amount was paid to CIJ. The MVA payments provided the funds that the joint venture needed to pay the fixed amount of yen to CIJ, but the amount of yen sent to CIJ was not dependent on the MVA payments. Thus, the Court of International Trade correctly held that the MVA payments were irrelevant for duty purposes and could not be a basis for liability against HAL, either for failing to disclose the MVA clause on the entry documents or for failing to notify Customs "at once" that the price on the entry documents was not accurate due to the receipt of MVA payments.

*E. Waivability of the Statute of Limitations as to Transactions Already Time–Barred*

▮ The statute of limitations applicable to 19 U.S.C. § 1592 actions is 19 U.S.C. § 1621, which in the case of negligent false reporting begins to run from the date of the allegedly negligent act.[13] There was a total of forty-two entries of subway cars into the United States, forty-one of which are contested here. After the statute of

limitations period had expired as to the first twenty-one entries, HAL and Hitachi Japan executed two-year written waivers to any statute of limitations defense. The waiver language was not limited to entries on which the statute of limitations had not already run. The Court of International Trade held, however, that while it had jurisdiction to consider liability on all entries, it could not lawfully use all entries as a basis for calculating HAL's penalty for negligence. *See Hitachi Am.*, 964 F.Supp. at 385–87. The Court of International Trade excluded the first twenty-one entries on the basis that the statute of limitations had already run before suit was brought by the government, and that the purported waiver was ineffective as to those already-expired claims because of the mandatory wording of the statute. *See id.* at 387.

The government contends that the waiver of the statute of limitations applied also to the entries on which the statute had already run. According to the government, the Court of International Trade improperly allowed HAL and Hitachi Japan to rescind their valid waivers. HAL, on the other hand, argues that these entries were properly excluded because the waivers could only apply to entries that at the time of the waivers were not yet time-barred. To hold otherwise, according to HAL, would allow the government to reacquire causes of action it did not possess as of the date the agreements were signed.

▮ The Court of International Trade gave effect to the waiver of the unexpired claims but not the expired claims, although it acknowledged that the language of the waiver agreement was not limited to the unexpired claims. *See id.* at 381–82. This conclusion is illogical because if section 1621 cannot be waived, it cannot be waived for either the expired or the unexpired

---

**13.** The statute of limitations applicable to fraud actions under section 1621 does not begin to run until the fraudulent offense is discovered, rather than the date of the offense. This difference between fraud and negligence claims is not at issue here because

the statute of limitations for fraud had not run against any of the entries before the waivers at issue were signed, because no fraud liability was imposed by the Court of International Trade, and because we find the fraud claim insupportable.

claims. Under settled law, if section 1621 is "jurisdictional" in nature, it cannot be waived by the parties under any circumstances (whether or not the claims are expired). *See Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 392–98, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). However, if section 1621 is not jurisdictional, then as merely an affirmative defense, the statute of limitations can be waived by the parties even for claims that have expired. It is well settled that parties can waive such an affirmative defense either by not raising it or by agreeing before trial not to assert it. *See* 51 Am.Jur.2d *Limitations of Actions* § 428 (1970) ("Whether or not to plead the statute of limitations is a personal privilege and the defense may be waived either before or after the expiration of the prescribed time limit."); *see also* Fed.R.Civ.P. 8(c) (listing statute of limitations as an affirmative defense); *In re Pugh,* 158 F.3d 530, 532, 538 (11th Cir.1998) (affirming district court decision holding that limitations periods could be waived and were waived by failure to assert the statute of limitations defense in an answer as required by Rule 8(c)); *United States v. McGee,* 993 F.2d 184, 186–87 (9th Cir.1993) (dismissing taxpayer's defense of expiration of statute of limitations because of prior waiver agreement with the government). Thus, if section 1621 is not jurisdictional, then the government can recover appropriate duties and penalties on all forty-two of the subway car entries at issue.

Here, HAL fails to dispute that section 1621 is not jurisdictional and agrees that this statute of limitations can be waived. Indeed, HAL does not contest that the statute of limitations defense was waived as to unexpired claims, which could not be the case if section 1621 were a jurisdictional limitation. Moreover, section 1621 does not refer in any way to the jurisdiction of the Court of International Trade and does not itself require that the waiver be obtained prior to the expiration of the claims. *Cf.* 26 U.S.C. § 6501(c)(4) (allowing extension of time for the assessment of tax where an agreement is entered into "before the expiration of the time prescribed in this section for the assessment of any tax ....."). Thus, contrary to the ruling below, this statute of limitations can be waived with respect to the expired claims as well as the unexpired claims.

■ Analysis of the language in the waiver agreements here compels the conclusion that the statute of limitations defense was in fact waived as to the expired claims as well as the unexpired claims. In the agreements, HAL agreed to "waive[ ] the period of limitations contained in [section 1621]" with respect to the forty-two entries and "agree[d] that it will not assert any statute of limitations defense in any action brought by [Customs] concerning the *forty-two entries* ....." (Emphasis added). Given that the language of the waiver in question was not limited to unexpired claims or some subset of the forty-two entries, but in fact referred to forty-two entries, there is no reason to conclude that the expired claims were not also waived. Judges should not undermine so clear an agreement reached by such sophisticated parties as these. If HAL had wished to limit the scope of the waiver, it could and should have done so in the language of the waiver agreement. It did not.

We hold that the Court of International Trade erroneously excluded the first twenty-one entries from consideration in its analysis of the amount of penalty owed. We therefore reverse the Court of International Trade's judgment with respect to this issue and remand for a recalculation of the amount of penalty to be imposed in light of our reversal.

## III.

*HAL's Cross–Appeal: The Amount of Duty Owed Depends on the Importation Price*

■ The maximum applicable penalty for a negligent non-reporting or false reporting in violation of the Customs statute is two times the duties avoided by the violation. *See* 19 U.S.C. § 1592(c)(3). Here, the Court of International Trade

assessed the maximum penalty, doubling the duties avoided (two times the duty owed: $772,985 \times 2 = $1,545,970),[14] and HAL does not contest the Court of International Trade's discretion to do so. The sole dispute is over which sales transaction must be used as a basis for calculating the penalty. The three available transactions are (1) the sale from Hitachi Japan to CIJ in Japan; (2) the sale from CIJ in Japan to the HAL/CIA joint venture in the U.S.; and (3) the sale between the joint venture and MARTA within the U.S. The value of the second sale, the import transaction value, was $632,102 (based on yen). The value of the third sale, the domestic transaction value, was $947,854 (based on dollars). The Court of International Trade determined that HAL was obligated to declare the import transaction value to Customs, which is the yen price paid or payable for the imported goods when they were sold for exportation to the United States. See Hitachi Am., 964 F.Supp. at 359. However, the Court of International Trade used the higher domestic dollar transaction value when calculating the penalty. See id. at 379–81. The Court of International Trade relied heavily on the absence of proof that the import transaction was at arm's length, yet this fact was never disputed by Customs and is conceded by the government on appeal. See id. at 380–81.

According to HAL, the penalty amount was in error because it was based on the domestic transaction value, the amount paid by MARTA to the HAL/CIA joint venture. HAL argues that it was improperly penalized based on the amount it received from its customer, MARTA, in a purely domestic transaction, even though what it should have reported to Customs was the import value transaction. Further, HAL argues that the Court of International Trade erred in ruling that HAL must remit an additional $96,399 in lost duties, because this amount was based on an audit of the purely domestic transaction between MARTA and the joint venture. HAL asserts that the Court of International Trade's conclusion is contrary to law because it is based upon an incorrect characterization of the import transaction as not at arm's length.

The government agrees with HAL that the correct transaction for penalty calculation purposes is the sale from CIJ to HAL/CIA, that this sale was at arm's length and that the Court of International Trade's "rationale for arriving at the penalty was flawed." However, the government stresses that only judgments are reviewed on appeal, not opinions, and argues that the Court of International Trade correctly used the domestic transaction value as its basis, even though that was not the sale that was legally relevant. The government argues that the true value of the HAL/CIA to CIJ sale is best assessed by looking at the higher domestic dollar transaction value rather than the yen transaction value it also proposed at trial, in part because more accurate records were allegedly available for computing the dollar transaction.

The Court of International Trade erred in basing the penalty on the domestic transaction value (based on dollars), rather than on the import transaction value (based on yen). The government attempts to justify the Court of International Trade's flawed analysis by supplying an alternate theory—that it was proper to use the dollar value of the domestic transaction as a way to assess the true value of the import transaction. However, as the Court of International Trade found, and the government asserted with respect to other issues on appeal, the import transaction was based on yen, and it makes no sense to re-assess the value of that transaction using the dollar value in the domestic transaction when the import transaction

---

**14.** The $772,985 figure is the amount of duty proposed by the government based on the domestic transaction, $947,854, reduced to account for the running of the statute of limitations period against the first twenty-one entries. See supra, section I (further details of these calculations).

is at issue. The government's assertion that the dollar transaction value is more reliable because the records are more accurate is not convincing in light of the fact that the government itself proposed the yen transaction value below without this reservation. If the import transaction's own value of $632,102 was flawed for some reason, as the Court of International Trade erroneously concluded, then the use of an alternate transaction to calculate the penalty might have been proper. But where both parties agree that the Court of International Trade's basis for its refusal to use the import transaction was erroneous as based on a false assumption, and we agree with their assessment, then there exists no reason to discard the import transaction value as a basis for computing the penalty.

The Court of International Trade properly noted that the parties are "related" under 19 U.S.C. § 1401a(g)(1) (1994), but that fact does not render the transaction unacceptable for valuation purposes "if an examination of the circumstances of the sale of the imported merchandise indicates that the relationship between such buyer and seller did not influence the price actually paid or payable." 19 U.S.C. § 1401a(b)(2)(b). The complex transactions between Hitachi Japan, CIJ, CIA, and HAL were set up for legitimate tax and payment reasons. There is no reason to conclude that some of the parties intended to use their corporate control over other parties improperly. No party asserts that this is the case. Nor can we see any sound basis for so concluding. Accordingly, the Court of International Trade's decision to use the domestic transaction value rather than the import transaction value as the basis for computing the penalty against HAL is reversed, the penalty amount is vacated, and the case is remanded with instructions to assess a penalty amount using the import transaction value.

The Court of International Trade also held that HAL owed $96,399 in additional duties based on a supplementary audit analyzing MVA payments made by MARTA domestically. As discussed above, the basis for this assessment of additional duty is flawed because it was based on the domestic transaction rather than the import transaction. Thus, the Court of International Trade's decision to use the domestic transaction to assess additional duties owed by HAL is reversed, the duty amount is vacated, and the case is remanded with instructions to assess any duties that HAL might owe using the import transaction value.

## IV.

*Hitachi Japan's Cross–Appeal: Liability for Aiding or Abetting*

As the Court of International Trade pointed out, the Customs laws asserted by the government, 19 U.S.C. §§ 1484, 1485, apply by their terms only to importers of record. *See Hitachi Am.*, 964 F.Supp. at 356. Because HAL is the importer of record, Hitachi Japan may not be held directly liable for a violation of those provisions and can only be liable under 19 U.S.C. § 1592(a)(1)(B) for aiding or abetting. *See id.*

In its cross-appeal, Hitachi Japan argues that the Court of International Trade erred as a matter of law in finding it liable for "aiding or abetting" HAL's negligent non-reporting or misreporting. Hitachi Japan alleges four errors on the part of the Court of International Trade, but its principal argument is that, as a matter of fundamental legal theory, a party cannot negligently aid or abet a merely negligent violation of a statute, including the customs statutes. Hitachi Japan argues that aiding or abetting has a knowledge and/or intent element that is missing here because mere negligence by the subsidiary, HAL, was found. Hitachi Japan contends that the Court of International Trade erred as a matter of law in applying a "should have known" (i.e., negligence) standard, and this aspect of the Court of International Trade's judgment should therefore be reversed.

The government's very limited response (consuming only one page of its briefs) to Hitachi Japan's arguments was that the plain meaning of section 1592(a) controls, and provides a penalty for aiding or abetting a violation, and violation is defined to include a negligent one. *See* 19 U.S.C. § 1592(a)(1) ("[N]o person, by fraud, gross negligence, or negligence—(A) may enter ... any merchandise into the United States by means of ... or (B) may aid or abet any other person to violate subparagraph (A)"). The government also relies on the Court of International Trade's findings that Hitachi Japan played "an active role" and "controlled the MARTA project" and provided a "duty budget," but these undisputed facts go only to the issue of whether Hitachi Japan's conduct might constitute aiding or abetting, not whether as a matter of law Hitachi Japan could negligently aid or abet HAL's negligent violation of the customs statute. Nor does the government's plain meaning argument speak to Hitachi Japan's contention, which depends not on the statute but on basic legal doctrine.

The Court of International Trade, unable to cite any pertinent and clearly applicable authority, resorted to interpreting and analogizing the Restatement of Torts to conclude that a party could unintentionally aid or abet a negligent violation of the customs laws. After concluding that the predicate act could be negligence, the Court of International Trade surmised that "[i]t would be absurd to condition aiding or abetting liability upon actual knowledge of the underlying tort when the principal tortfeasor might not have discerned the foreseeable risk of harm." *Hitachi Am.*, 964 F.Supp. at 376–77. The Court of International Trade provided no citation whatever to binding or even persuasive on point legal authority nor any examples of "absurd" results that would occur if a party was required to intend to aid or abet a negligent act. The Court of International Trade then interpreted the language from the Restatement "to the effect that a defendant must 'know[ ] that the other's conduct constitutes a breach of

duty' [to] mean[ ] that an aider or abettor of negligence *should have known* that the underlying tort was being committed." *Id.* at 377 (emphasis added). This is too thin a reed to support an inference that a party can aid or abet a negligent violation without any actual knowledge or intent. The Restatement is a summary of judge-made tort law between private parties or between a private party and a governmental entity acting as a business, a far different regime than that of statutes governing the obligations of importers to the government acting as sovereign.

Even if the Restatement were binding authority, under a straightforward interpretation of the pertinent language, the Restatement itself requires knowledge that the underlying act is tortious. Indeed, the Restatement provides only that "one is subject to liability if he ... (b) *knows* that the other's conduct constitutes a breach of duty ...." Restatement (Second) of Torts § 876 (1979) (emphasis added). Thus, even the Restatement does not provide firm support for the Court of International Trade's conclusion.

Rather, legal authority in various civil and criminal contexts supports the view that liability for aiding or abetting requires, *inter alia*, proof of knowledge of unlawfulness, also articulated as intent to violate the law. For example, in addressing civil liability for aiding and abetting violations of both racketeering and federal securities laws, federal courts have insisted that intent to violate be proven for any aiding and abetting liability to arise. *See, e.g., Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 270 (3d Cir.1995) (requiring plaintiffs in civil RICO actions to prove "that the defendant alleged to have aided and abetted the act knew of the commission of the act [here, fraud] and acted with intent to facilitate it"); *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir.1991) ("Some knowledge must be shown .... [n]egligence, however, is never sufficient."); *Securities and Exchange Comm'n v. Coffey*, 493 F.2d 1304, 1315 (6th Cir.

1974) (aider and abettor must "knowingly and substantially assist[ ] the violation"). This "knowledge" or "intent" requirement is equally applicable for criminal liability. *See, e.g., United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir.1990) ("Aider and abettor liability is not negligence liability. The aider and abettor must know that he is assisting illegal [criminal] activity."). In addition, in a patent infringement context "[w]e have recognized that 35 U.S.C. § 271(b) provides a remedy against 'actively and *knowingly aiding and abetting* another's direct infringement,'" *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1195 (Fed.Cir.1996) (emphasis added) (quoting *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed.Cir.1988)), even though "section 271(b) does not use the word 'knowing.'" *Water Techs.*, 850 F.2d at 668.

In stark contrast to the abundance of case law authority requiring knowledge or intent to prove aiding and abetting liability, is the complete absence of citation by the government to any case law holding a party liable for negligently aiding and abetting a negligent act. Indeed, to state the proposition is to utter a non sequitur because the conclusion, that Hitachi Japan is liable for aiding or abetting, does not follow from the premise that Hitachi Japan merely should have known that HAL was violating any customs laws. Nor are we independently aware of any such authority. Thus, although a literal reading of 19 U.S.C. § 1952(a) might at first blush suggest the possibility that a party can be found liable for negligently aiding or abetting negligence, any such interpretation would conflict with the generic requirement to show knowledge or intent to establish aiding or abetting liability and, in any event, is itself wholly without support and inconsistent with fundamental legal logic. We therefore reverse the Court of International Trade on this legal issue. But we need not remand for a determination of whether Hitachi Japan knowingly aided or abetted HAL's violations, because it is clear on this record that it no more had such intent than did HAL.

## V.

## CONCLUSION

The Court of International Trade correctly dismissed the counts of fraud and gross negligence against HAL; properly refused to penalize HAL for failing to disclose the EPA clause on entry documents, because to do so would be a violation of the Due Process Clause; and properly found the domestic MVA payments in dollars to be irrelevant. However, the Court of International Trade erred when it removed the first twenty-one entries from consideration in its calculation of the amount of the penalty, based on a statute of limitations defense; erred when it based its calculation of the penalty against HAL on the domestic transaction; and erred when it held Hitachi Japan liable for aiding or abetting HAL's negligent violations. Accordingly, the judgment of the Court of International Trade is

*AFFIRMED–IN–PART, VACATED–IN–PART, REVERSED–IN–PART* and *REMANDED.*

## COSTS

The government shall bear the costs of HAL and Hitachi Japan, as well as its own costs.