**Slip Op. 07-142**

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                          :
UNITED STATES,                            :
                                          :
    Plaintiff,                      :
                                          :
                                          :  Court No. 01-01106
    v.                              :
                                          :
INN FOODS, INC.,                          :
                                          :
    Defendant.                      :
_____:


       Held: Inn Foods' entry into the United States of the merchandise subject to this action constituted fraud in violation of 19 U.S.C. § 1592. Judgment is entered for Plaintiff.

       Peter D. Keisler, Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Michael S. Dufault and David S. Silverbrand) for Bureau of Customs and Border Protection, for the United States, Plaintiff.

       Horton, Whiteley & Cooper (Robert Scott Whiteley; Michael Jon Horton) for Inn Foods, Inc., Defendant.

                           Dated: September 25, 2007


## OPINION

       **TSOUCALAS, Senior Judge**: The Bureau of Customs and Border Protection of the Department of Homeland Security ("Customs" or

"Plaintiff")[1] commenced this action against Inn Foods, Inc. ("Inn Foods" or "Defendant") to recover civil penalties and collect customs duties for fraudulent, grossly negligent or negligent violations of section 592 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1592 (1988).[2] This case is before this Court on remand from the United States Court of Appeals for the Federal Circuit. See United States v. Inn Foods ("Inn Foods CAFC"), 383 F.3d 1319 (2004).

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1582 (2000). For the reasons explained below, the Court finds in favor of Plaintiff, that Inn Foods' entry into the United States of the merchandise subject to this action constituted a fraudulent violation of § 1592.[3]

**BACKGROUND**

Inn Foods, a California company established in 1976, is a

---

[1] The Bureau of Customs and Border Protection was renamed United States Customs and Border Protection, effective March 31, 2007. See Name Change From the Bureau of Immigration and Customs Enforcement to U.S. Immigration and Customs Enforcement, and the Bureau of Customs and Border Protection to U.S. Customs and Border Protection, 72 Fed. Reg. 20,131 (April 23, 2007).

[2] The subject entries span § 1592 (1988) and § 1592 (1982). The relevant language is identical in all material respects.

[3] Because the Court finds that Defendant has committed a fraudulent violation of § 1592, it does not address the merits of Plaintiff's alternative gross negligence and negligence claims.

"source of frozen fruits and vegetables for food services, industrial and private label markets."[4]   Inn Foods and Seaveg, Ltd., a Cayman Islands corporation, were founded by Jack Randle and Fred Haas as subsidiaries of the same parent company. See Trial Transcript ("Tr.") vol. 3, 366-71, Feb. 23, 2007.   This case involves the importation of frozen produce into the United States by Inn Foods and Seaveg from six Mexican growers, from a period commencing on or about January 22, 1987 to on or about January 19, 1990.  See Complaint ("Compl.") ¶ 6.

On December 14, 2001, the United States filed a Complaint against Inn Foods "to enforce a claim for civil penalties, and to collect lawful Customs duties and fees of which the United States was deprived as a result of violations of  19 U.S.C. § 1592(a)."[5] Compl. ¶ 2.

This case is before the Court on remand from Inn Foods CAFC, 383 F.3d 1319.  A three day bench trial was held February 21 through February 23, 2007.  Parties submitted post-trial briefs on March 14, 2007.  Pursuant to USCIT Rule 52(a), "[i]n all actions tried upon the facts without a jury . . . , the court

---

[4]
http://www.innfoods.com/index.cfm/fuseaction/companies.main/

[5]    At the United States' request Inn Foods agreed to four successive two-year waivers of the statute of limitations contained in 19 U.S.C. § 1621 beginning on December 15, 1993. See Inn Foods CAFC, 383 F.3d at 1321.

shall find the facts specially and state separately its conclusions of law thereon." USCIT R. 52(a).

Inn Foods stipulated, regarding the subject entries, that "[t]he prices declared to Customs for the entries that are the subject of the complaint filed in this matter, which are represented in Plaintiff's Exhibit 1, were undervalued and did not reflect the prices actually paid to the six Mexican growers/packers." Joint Stipulation of Undisputed Material Facts ¶ 1. Inn Foods also stipulated that the "dutiable values, and loss of revenue for each of the entries represented in Plaintiff's Exhibits 1 and 2, are correct." Id. at ¶ 2; Exhibit ("Ex.") 1 and 2.[6] The lost duties were stipulated to be in the amount of $624,602.55, plus interest.[7] See id.

Since Inn Foods has acknowledged "erroneous compliance" in entering the produce described herein into the United States, the central question for this Court is the level of culpability attributable to Inn Foods (i.e., fraud, gross negligence or negligence) and the penalties to be imposed. See Def.'s post-trial Br. ("Def.'s Br.") at i.

---

[6] Plaintiff's exhibits are numerically designated while Defendant's are alphabetically designated.

[7] This amount is composed of $618,356.85 in lawful duties and $6,245.70 in merchandise processing fees. See Compl. ¶ 18.

## DISCUSSION

The Inn Foods contracts with the Mexican growers at the heart of this case are easily summarized. Seaveg, the exclusive broker on most of the agreements, established an initial market price for the merchandise. Seventy percent of the initially set sales price would be paid upon Inn Foods receiving the produce in cold storage in the U.S., with the remaining thirty percent paid within sixty days of entry (subject to certain adjustments).[8] See Pl.'s post-trial Br. ("Pl.'s Br.") at 4; Ex. 52-58. The final price, therefore, would not be known until the goods were resold by Inn Foods. See id.

Customs claims that the produce that is the subject of this action was "entered, introduced or caused to be entered or introduced, into the United States by means of material and false documents, statements, acts and/or omissions, in that Inn Foods knowingly, intentionally, and fraudulently filed or caused to be filed, and/or aided or abetted Seaveg in the filing of entry documents that contained materially false statements or omissions" in violation of 19 U.S.C. §§ 1481, 1484 and 1592.

---

[8] The adjustments include: (1) a four percent packer allowance deducted for Inn Foods; (2) a three percent brokerage fee deducted for Seaveg; (3) deductions for all storage and inspection costs; and (4) a deduction if the eventual sales price was lower than the initial Seaveg-set price or a splitting of profits with the packer if the eventual sales price was higher than the initial Seaveg-set price. See Ex. 52-58.

Compl. ¶ 11.  Inn Foods responds that "its good faith, but erroneous compliance in this case was the result of ordinary negligence borne out of inexperience in Customs matters." Def.'s Br. at i.

At trial the Court heard testimony from ten witnesses. Customs produced eight witnesses who testified, among other things, to factual matters concerning: (i) the import operations of Inn Foods and Seaveg, including the nature of the agreements between Inn Foods and Seaveg and the Mexican growers; and (ii) Customs' investigation of Inn Foods and Customs' factual findings resulting from the investigation.[9]  Inn Foods produced two witnesses who testified, among other things, to factual matters concerning the import operations of Inn Food and Seaveg, including the nature of the agreements between Inn Foods and Seaveg and the Mexican growers.[10]

---

[9] The eight Customs witnesses (and titles during the time in question) produced were Cathy Sauceda, import specialist for Customs (Trial Tr. vol. 1, 25-26, Feb. 21, 2007); Lawrence Krautkremer, Customs investigator (Id. at 86); Rosa McLean, regulatory auditor for Customs (Trial Tr. vol. 2, 143, Feb. 22, 2007); Carlos Martinez, auditor for Customs (Id. at 170); Elizabeth Olivarez, account manager with Inn Foods (Id. at 238); Ronald Maker, chief financial officer for VPS Companies (Id. at 297); Irma Villarreal, office manager at B&D Brokers (Trial Tr. vol. 3, 333, Feb. 23, 2007); and Fred Haas, co-owner of VPS and Secretary/Treasurer of Inn Foods (Id. at 366-67).

[10] The two Inn Foods witnesses (and titles during the time in question) produced were Louise McNary, Inn Foods' accounting supervisor (Trial Tr. vol. 3, 360, Feb. 23, 2007); and Jack Randle, Chairman of the Board of the VPS companies (Id. at 394).

At trial Customs introduced documents relating to its investigation (including (i) the contractual agreements between Inn Foods and Seaveg and the Mexican growers, and (ii) the factura invoices upon which Customs duties were paid along with the corresponding Inn Foods invoices) and the Court admitted such documents into evidence.

The Court finds the documentary evidence introduced by Customs coupled with the testimonial evidence obtained by Customs highly probative.

In accordance with USCIT R. 52(a) and having given due consideration to the testimony of all ten witnesses and numerous exhibits presented at trial and admitted by the Court, the Court enters judgment in favor of Plaintiff pursuant to the following findings of fact and conclusions of law.

## I.   FINDINGS OF FACT

### A.  The relationship between Inn Foods and Seaveg

1.   Inn Foods and Seaveg, Ltd. ("Seaveg") were founded by Jack Randle and Fred Haas as subsidiaries of the same parent company. See Trial Tr. vol. 3, 369-71, Feb. 23, 2007.  Inn Foods was founded in the 1970's. See id. at 368.

2.   Seaveg, a Cayman Islands corporation, was formed as a shell company to facilitate sales to customers who did not want to buy from Inn Foods (i.e., by using a different corporate

name that would not necessarily be associated with Inn Foods). See id. at 371; Compl. ¶ 4.

3.  Inn Foods and Seaveg were located and operated in the same building in Watsonville, California. See Ex. 46-49. Inn Foods and Seaveg had the same phone number and the same address. See Trial Tr. vol. 1, 65, Feb. 21, 2007.

4.  Inn Food and Seaveg had the same principals (Mr. Randle and Mr. Haas) and shared employees. See Trial Tr. vol. 2, 243-44, 246, Feb. 22, 2007. Mr. Randle and Mr. Haas were the final authority for all business decisions involving both Inn Foods and Seaveg. See Trial Tr. vol. 3, 373, Feb. 23, 2007.

5.  Ms. Olivarez, who worked for both Inn Foods and Seaveg, considered Seaveg to be a department of Inn Foods. See Trial Tr. vol. 2, 243-44, Feb. 22, 2007.

6.  The books of accounting for Inn Foods and Seaveg were organized as if they were for one corporate entity. See id. at 173, 228.

7.  In the Seaveg sales agreement dated March 30, 1989 with one of the Mexican packers (La Esperanza of Miranda, S.P.R.R.L.) "Seaveg Limited/Inn Foods, Inc." is listed as the entity with whom the agreement is made. Ex. 54

8.  Checks for merchandise were issued from Inn Foods regardless of whether Seaveg or Inn Foods was the importer of record.

See Trial Tr. vol. 1, 65, Feb. 21, 2007; Ex. 73.

9.  Mr. Randle and Mr. Haas appointed Lou Colon as President of Seaveg. See Trial Tr. vol. 3, 374-75, Feb. 23, 2007. Mr. Colon reported directly to them and did not have any final authority in any decisions involving Seaveg. See id. at 375.

10. Mr. Colon initiated import orders for the subject entries by calling the particular Mexican grower and placing an order at a particular price. See Trial Tr. vol. 2, 284-85, Feb. 22, 2007.

11. Seaveg filed for Chapter 7 bankruptcy and was dissolved on December 1, 1998, in order to avoid the possible payment of Customs duties and penalties. See id. at 306; Trial Tr. vol. 3, 384, Feb. 23, 2007; Compl. ¶ 4.

12. Inn Foods was a participant on some level in all the Seaveg actions described herein.

**B.  The Sales Agreements**

13. Inn Foods and Seaveg entered into sales agreements with six Mexican growers to purchase frozen produce for importation into the United States (the "Sales Agreements"). See Ex. 52-58; Trial Tr. vol. 2, 201-04, Feb. 22, 2007. These Sales Agreements contained nearly identical language and structure, and each was signed by either Mr. Haas or Mr.

Colon. See id.

14.    Seaveg was the exclusive broker on most of the Sales
       Agreements and established the initial market price of the
       frozen produce. See Ex. 52-58.

15.    Pursuant to the Sales Agreements, seventy percent of the
       purchase price would be paid upon Inn Foods' and Seaveg's
       receipt of the produce at designated cold storage locations
       in the Unites States.  See Ex. 52-58.  The remaining thirty
       percent would be paid within sixty days of delivery into
       storage after certain adjustments were made.  See id.

16.    For each order, the Mexican growers issued an invoice (a
       "factura"), which then was sent to Inn Foods or Seaveg. See
       Trial Tr. vol. 2, 285-86, Feb. 22, 2007.  The factura
       invoices would contain a specific invoice number and product
       description. See id.

17.    The factura invoices submitted to Customs by the Mexican
       packers did not reflect the price ultimately paid by Inn
       Foods for the merchandise.  Joint Stipulation of Undisputed
       Material Facts ¶ 1.

18.    For each order, Mr. Colon's assistant, Ms. Olivares, would
       bring the factura invoice to Mr. Colon for him to reprice
       the invoice (i.e., to adjust the value of the produce higher
       in line with the Mexican grower's remittance amount).  See
       Trial Tr. vol. 2, 251-57, 286, Feb. 22, 2007.

19. Ms. Olivares would then enter the adjusted prices into Inn Foods' accounting system along with the original Mexican invoice number and description of the goods from the factura.  See id. at 286-87.

20. After Ms. Olivares entry function, Inn Foods would create its own invoice for the specific transaction (retaining the original Mexican invoice number and item description).  See id. at 287-88.  Upon this Inn Foods invoice, Inn Foods would type the calculations of the amount that would be the Mexican grower's remittance.  See id. at 288.

21. Inn Foods would subsequently send an order confirmation to the Mexican grower with the adjusted price. See id. at 287-88.

22. For certain subject entries, the Mexican growers would send B&D their invoices prior to the entry of goods and B&D would forward them on to Inn Foods to inform Inn Foods of the shipment and to allow Inn Foods to check the accuracy of the invoice. See Trial Tr. vol. 3, 344-47, Feb. 23, 2007.

23. Inn Foods maintained both the undervalued Mexican growers' invoices and the adjusted Inn Food generated invoices in their accounting files.  See Ex. 3-40.

24. After each of the subject entries was made and Customs duties paid, Inn Foods' Customs broker, B & D Customhouse Brokers, Inc. ("B&D") would send Inn Foods their broker bill

containing an itemization of costs incurred for the particular entries, which included a copy of the undervalued Mexican factura invoice and the Customs duty paid on that factura invoice. See Trial Tr. vol. 1, 62, Feb. 21, 2007; Trial Tr. vol. 3, 338-41, Feb. 23, 2007; Ex. 73.

25. Each of the B&D broker bills was reviewed by Inn Foods' accounting supervisor, Ms. McNary, or by the person assisting Ms. McNary with that particular Mexican grower account. Trial Tr. vol. 2, 281-84, Feb. 22, 2007; Trial Tr. vol. 3, 342-43, Feb. 23, 2007.

26. B&D stressed to Mr. Colon on several occasions the importance of ensuring that the actual value being presented to Customs for the subject entries was accurate upon entry. See Trial Tr. vol. 3, 344, Feb. 23, 2007.

27. Mr. Colon confirmed to both B&D and to Achilles Customs Broker ("Achilles"), another Inn Foods' customs broker, that the values presented on the factura invoices were accurate. See Trial Tr. vol. 1, 116-19, Feb. 21, 2007.[11]

28. Mr. Colon would sometimes call Achilles regarding questions

---

[11] The B&D office manager had explained to Mr. Colon in detail in a phone conversation how Customs' duties were determined. Trial Tr. vol. 1, 116, Feb. 21, 2007. In the conversation with the Achilles Customs Broker where Mr. Colon verified that the prices were correct, Mr. Colon told the Broker that he had been able to obtain the produce at a good price. Id. at 118-19.

on particular shipments, and refer to information from the factura invoices. See Trial Tr. vol. 1, 118-20, Feb. 21, 2007.

29. One of the Mexican growers - Fruveza - sent a letter to Seaveg specifically demonstrating that their typical factura would undervalue the price of the goods they shipped.[12] See Trial Tr. vol. 2, 276-79, Feb. 22, 2007. Ex. 69.

30. On April 17, 1989, B&D directed a letter (the "B&D Letter") to Ms. Sauceda on Inn Foods' behalf stating that the value on shipments of frozen vegetables "entered as of April 10, 1989 is strictly for Customs clearance." The letter also added that "[l]iquidation of said entries is to be withheld until the importer of record, SeaVeg, Ltd. / Inn Foods, Inc., is able to complete the audit of their files and arrive at a true transaction value." Trial Tr. vol. 1, 79-80, Feb. 21, 2007; Trial Tr. vol. 3, 354-57, Feb. 23, 2007; Ex. F.

31. Before the B&D letter neither Inn Foods nor Seaveg ever

---

[12]     The Fruveza letter (in Spanish with a handwritten translation by Ms. Olivarez) addressed to Mr. Colon and Ms. Olivarez, lists five Conditions of Sale, and concludes with an example of how a typical shipment of broccoli spears would appear on their factura invoice. The example has two lines: (1) the first line is translated by Ms. Olivarez as "We ship 1500 112/21 Broccoli Spears at 0.50/lb" and (2) the second line is translated by Ms. Olivarez as "My invoice will read 1500 112/21 Spears at 0.28/lb." Ex. 69.

informed B&D that the final price of the frozen produce would not be determined until after their entry into the United States and that the factura invoices did not contain true transaction values.  See Trial Tr. vol. 3, 356-57, Feb. 23, 2007.

32.  Before April 1989 neither Inn Foods nor Seaveg ever informed Customs that the final price of the frozen produce would not be determined until after their entry into the United States and that the factura invoices did not contain true transaction values.  See Trial Tr. vol. 1, 62-63, Feb. 21, 2007.

33.  Neither Inn Foods nor Seaveg filed updated or amended entry forms that contained updated values of the goods imported. Id. at 63.


**C. Customs' Investigation**

34.  Cathy Sauceda, a Customs import specialist, processed Inn Foods' and Seaveg's import entries of frozen produce beginning in 1988.  See id. at 36.

35.  In July and October 1988, Ms. Sauceda made formal requests (via Customs Form 28 or "CF 28s") to Inn Foods for documentation of payments for the produce contained in each subject entry.  See id. at 48-49.  Inn Foods never responded

to Ms. Sauceda's initial request.  <u>See</u> <u>id.</u>

36.  Ms. Sauceda issued a CF 28 follow-up request for information in February 1989. <u>See</u> <u>id.</u>  In March 1989, after the third CF 28 was sent, Ms. Sauceda received Inn Foods' response. <u>See</u> <u>id.</u> at 50.

37.  After receiving Inn Foods' response, Ms. Sauceda discovered that the amount paid by Inn Foods to the Mexican sellers for the subject entries was higher than the corresponding entries on the Mexican factura invoices presented to Customs. <u>See</u> <u>id.</u> at 50-51.

38.  Ms. Sauceda contacted Inn Foods about the price discrepancies she observed. <u>See</u> <u>id.</u> at 56-60. During one such call to Inn Foods, Ms. Sauceda asked Ms. McNary if Inn Foods used another invoice in addition to the Mexican factura and was told by Ms. McNary that the factura invoice was the only invoice. <u>See</u> <u>id.</u> at 58.  The following day Ms. Sauceda informed Mr. Colon of the false invoice she had seen and informed him of the Prior disclosure statute (<u>i.e.,</u> 19 C.F.R. § 162.74). <u>See</u> <u>id.</u> at 58-59.

39.  Ms. Sauceda spoke with Inn Foods' Customs brokers, B&D and Achilles, and confirmed that they both would provide Seaveg and Inn Foods copies of the factura invoices that were being presented to Customs for the shipments they were importing. <u>See</u> <u>id.</u> at 61-62.

40. On April 10, 1989, Ms. Sauceda informed Mr. Colon that she had referred the Inn Foods case for investigation. See id. at 60.

41. After receiving Ms. Sauceda's referral in May 1989, Customs Special Agent Larry Krautkremer initiated an investigation of Inn Foods in June 1989. See id. at 88-89. Ex. 42d at 1248; 42h at 1275.

42. Inn Foods attempted to make a prior disclosure on July 19, 1989. See Trial Tr. vol. 1, 83, Feb. 21, 2007. Inn Foods and Seaveg failed to make this disclosure before Ms. Sauceda informed Mr. Colon of her referral of the case for investigation on April 10, 1989. See id. at 60-61, 83.

43. During the period of investigation Seaveg declared bankruptcy. See Trial Tr. vol. 3, 384-85, Feb. 23, 2007.

44. The domestic value of the subject produce at issue here was $15,319,513.35. Ex. 2.

## II. CONCLUSIONS OF LAW

### A. Inn Foods is responsible for all liabilities

Inn Foods argues that "[t]here is no evidence in the record of knowledge or intent on [its part] to fraudulently aid and abet Seaveg in the filing of false entries." Def.'s Br. at 12. This

contention misrepresents the facts of the case as to the relationship between Inn Foods and Seaveg.  It bears noting here that Inn Foods and Seaveg (i) were owned and controlled by the same people;  (ii) had the same phone number and operated from the same building; (iii) utilized the same employees and officers, and utilized them in the same roles; (iv) paid invoices, regardless of which of the two was the importer of record, from Inn Foods' accounts; (v) had intermingled accounting ledgers; (vi) would combine their names in certain of their contracts and (vii) appeared to be the same entity for all intents and purposes to both its own employees and to Customs. Seaveg, a shell corporation, was admittedly created solely to assist Inn Foods, an operating company and its sister subsidiary, to better conduct its business by providing Inn Foods the use of a different company name to facilitate sales without raising the ire of certain customers. See  Trial Tr. vol. 3, 371, Feb. 23, 2007.

This Court's predecessor stated that "[a] corporation may be an *alter ego* or business conduit of another and its separate corporate existence will not be recognized where it is so organized and controlled and its business conducted in such a manner as to make it merely an agency or instrumentality of the other corporation."  Service Afloat, Inc. v. United States, 68

Cust.Ct. 225, 232, 337 F.Supp. 458, 464 (1972)(citation omitted); see also VWP of America, Inc. v. United States, 21 CIT 1109, 1115, 980 F. Supp. 1280, 1287 (1997) (vacated on other grounds)("The Court will look through the form to find the underlying function. If it is apparent that a subsidiary is merely an alter ego of the parent, the Court will not hesitate to disregard the constructive fiction."). In this case Seaveg is an alter ego, or perhaps more appropriately an alias, of its sister subsidiary Inn Foods. Therefore, the fact that Seaveg and Inn Foods were incorporated as two separate entities does not shield Inn Foods from Customs duties and penalties owed on actions it took partly under the name of Seaveg.

In addition, the Court finds that the Inn Foods corporate entity itself was involved in one way or another (as described supra) in the transactions that are at issue in this case. For the foregoing reasons, Inn Foods is responsible for all the Customs duties and penalties owed in the actions described herein.

### B. Inn Foods' Conduct was Fraudulent

Customs has alleged that Inn Foods violated 19 U.S.C. § 1592, thereby depriving the United States of a portion of lawful duty through fraud, or in the alternative, gross negligence or negligence. See Compl. ¶¶ 23, 26, 29. In actions

brought for the recovery of any monetary penalty claimed under this provision, all issues are tried de novo, including the amount of the penalty. See 28 U.S.C. § 2640(a)(6); 19 U.S.C. § 1592(e)(1).

A violation of 19 U.S.C. § 1592(a)(1) occurs when a person or entity makes a material false statement or omission in connection with the entry of merchandise into the United States and that false statement or omission is the result of fraud, gross negligence, or negligence. See 19 U.S.C. §1592(a)(1)(1988). The level of culpability has a direct correlation to the maximum amount of penalty that can be assessed. See 19 U.S.C. § 1592(c).

In pertinent part, 19 U.S.C. § 1592(a)(1) states:

Without regard to whether the United States is or may be deprived of all or a portion of any lawful duty thereby, no person, by fraud, gross negligence, or negligence–

(A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of–

(i) any document, written or oral statement, or act which is material and false, or

(ii) any omission which is material . . .

19 U.S.C. § 1592(a)(1).

To prove a fraudulent violation of the statute, the Plaintiff must establish, by clear and convincing evidence, that the Defendant (1) deliberately introduced merchandise into the commerce of the United States by means of material false statements, acts or omissions; and (2) with intent to defraud the revenue or otherwise violate the laws of the United States. See 19 U.S.C. §§ 1592(a)(1),(e)(2); United States v. Thorson Chemical Corp., 16 CIT 441, 447, 795 F. Supp. 1190, 1195 (1992)(citing United States v. Daewoo Int'l (America)Corp., 12 CIT 889, 896, 696 F. Supp. 1534, 1541 (1988)).

**(i) The statements were material and false.**

The Customs regulations define a material statement as one which "has the potential to alter the classification, appraisement, or admissibility of merchandise, or the liability for duty." 19 C.F.R. Pt. 171, App. B(A) (1988). The issue of materiality is for the Court to determine. See United States v. Hitachi Am., Ltd., 21 CIT 373, 386, 964 F. Supp. 344, 360 (1997), aff'd in part and rev'd in part on other grounds, 172 F.3d 1319

(Fed. Cir. 1999); see also <u>United States v. Rockwell Int'l Corp.</u>, 10 CIT 38, 42, 628 F. Supp. 206, 210 (1986) (stating that "the measurement of the materiality of the false statement is its potential impact upon Customs determination of the correct duty for the imported merchandise").

As this Court has stated in the past, Section 1592 does not define the term "false," and this Court has not specifically addressed the meaning of the term in the statute; therefore, "false" must be defined according to its common and ordinary meaning. <u>See United States v. Rockwell Automation Inc.</u>, 30 CIT __,__, 462 F. Supp. 2d 1243, 1248 (2006), (<u>citing</u> <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979)).

The materiality and falseness of the factura invoices presented to Customs in this case are not really in question since it is not disputed that (i) the duties Customs received for the subject entries were solely based on these factura invoices[13] and (ii) these factura, which contained valuations of the merchandise that were significantly less than the later created Inn Foods invoices for the same goods, resulted in significantly less duties paid than what was lawfully due. <u>See</u> Ex. 63; Trial

---

[13]    Which duties were assessed on an 17.5% <u>ad</u> <u>valorem</u> duty under the Harmonized Tariff Schedules of the United States and an <u>ad</u> <u>valorem</u> merchandise processing fee of .17%. <u>See</u> Trial Tr. vol. 3, 343-44, Feb. 23, 2007; Compl. ¶ 17.

Tr. vol. 1, 55-56, Feb. 21, 2007.  These false invoices, relied on by Customs, prevented Customs from making the proper determination of the value of the merchandise and, therefore, of the lawful duties owed.

The Court finds that Customs has demonstrated the materiality and falsity necessary for fraud through the documentary evidence introduced (including the factura invoices and the corresponding and subsequently created Inn Foods invoices), in combination with the testimonial evidence that explains the accounting and business procedures Inn Foods had in place in support of their double-invoicing system.

**(ii) The intent to defraud.**

To prove a fraudulent violation of § 1592, the United States must establish by clear and convincing evidence that the importer "'knowingly' entered goods by means of a material false statement [or omission]."  United States v. Hitachi Am., Ltd., 172 F.3d 1319, 1326 (Fed. Cir. 1999); 19 U.S.C. § 1592(a).  That is to say, Customs must demonstrate that "the material false statement or act in connection with the transaction was committed (or omitted) knowingly, i.e., was done voluntarily and intentionally."  United States v. Obron Atl. Corp., 18 CIT 771, 778, 862 F. Supp 378, 384 (1994) (citing 19 C.F.R. Pt. 171, App.

B); United States v. Jac Natori Co., Ltd., 17 CIT 348, 352, 821

F. Supp 1514, 1519 (1993).  "Intent is a factual determination

particularly within the province of the trier of fact."  Allen

Organ Co. v. Kimball Int'l, Inc., 839 F.2d 1556, 1567 (Fed. Cir.

1988).

It is undisputed that for each shipment of merchandise Inn

Foods received two, and sometimes three, copies of the

undervalued facturas presented to Customs by the Mexican growers:

first, Inn Foods received a copy of the false and undervalued

factura invoice directly from the applicable Mexican grower (see

Trial Tr. vol. 2, 285-86, Feb. 22, 2007); second, B&D would, when

available, also send a copy of the factura invoices to alert Inn

Foods of the shipment before it crossed the U.S. border (see

Trial Tr. vol. 3, 344-48, Feb. 23, 2007); lastly, B&D would

forward the factura invoices along with their Broker's bill (see

Trial Tr. vol. 2, 284, Feb. 22, 2007).  Inn Foods knew that these

false invoices contained, in every instance, undervalued prices

for the merchandise, because the Inn Foods' "re-pricing" process

entailed creating a subsequent Inn Foods invoice, combining

identification information from the factura invoice with the

original higher price negotiated for the purchase.  There is

therefore no question that Inn Foods reviewed both invoices and

knew the factura invoices were not matching up with the

corresponding Inn Foods invoices.[14]

Furthermore, B&D stressed to Inn Foods several times the importance of ensuring that Customs received the actual value for ad valorem merchandise (i.e., all the frozen produce subject herein) and the B&D office manager had explained to Mr. Colon in detail the process through which Customs' duties were determined. See Trial Tr. vol. 3, 344, Feb. 23, 2007.  Inn Foods' contention in its post-trial brief that as "[a] novice importer, [it] relied on the Mexican exporters and their customs brokers to create the documents used to make declarations and to enter merchandise," rings untrue.  Def.'s Br. at 10.  Despite Inn Foods' claim of "inexperience in Customs matters," at the time of this action Inn Foods had already been in business for years and the shipments in question were not a one-time occurrence, but spanned approximately three years.  Trial Tr. vol. 3, 368, Feb. 23, 2007; Ex. 1.  In fact, far from the babe in the woods, it is clear from the totality of the evidence that Inn Foods' intent was to conceal the undervaluation scheme both from Customs and from Inn Foods' own Brokers and to mislead both as to the true value of

---

[14]     For example, the Broker bill was checked for accuracy by Inn Foods' controller, Ms. McNary (see Trial Tr. vol. 2, 316-19, Feb. 22, 2007); and Mr. Colon would sometimes call the Brokers regarding questions on the factura invoices on particular shipments (see Trial Tr. vol. 1, 118-20, Feb. 21, 2007).

the goods they were importing.[15]

In summation, as the government has demonstrated, the Defendant's undervaluation scheme is a simple one. Inn Foods and Seaveg entered into sales agreements with Mexican growers to purchase frozen produce for importation into the United States. See Ex. 52-58. Mr. Colon would secure the initial market price for each subject entry from the Mexican growers over the telephone. See Trial Tr. vol. 2, 284-85, Feb. 22, 2007. Once this initial, actual, price was established, the Mexican packer would issue an undervalued factura invoice for the purposes of paying less Customs duties. See Trial Tr. vol. 2, 285-86, Feb. 22, 2007. These undervalued invoices were later sent to Inn Foods and Inn Foods would create a second, accurately priced, invoice based on product information in the factura. One invoice served to bring the produce into the United States at a reduced cost and thus defrauded Customs of duties, the second to keep accurate accounting records.

It is impossible to escape the conclusion that there was, at the very least, an implicit yet very clear understanding between

---

[15]    For example, although Inn Foods now acknowledges the double-invoicing system in place at the time, during the Customs follow-up call from Ms. Sauceda, Ms. McNary told Ms. Sauceda, with what must have been full knowledge of the falsity of the statement, that the factura invoice was the only invoice. Trial Tr. vol. 1, 58-59, Feb. 21, 2007.

Inn Foods and the Mexican growers to undervalue the produce that Inn Foods and Seaveg were importing.  Therefore, the Court finds that Inn Foods' entry of the subject merchandise into the Unites States by means of false and undervalued invoices was voluntary and intentional.  Customs has thus satisfied this element of fraud by proving by clear and convincing evidence that the material false statements presented in the factura invoices were made with the intention of undervaluing the subject entries and thus defrauding Customs of lawfully owed duties.

The Court finds that Inn Foods fraudulently introduced merchandise into the commerce of the United States by means of material and false documents in violation of 19 U.S.C. § 1592(a)(1).

### C.  Additional points raised by Inn Foods

### (i) The lack of profit motive

Inn Foods argues that because there was agreement between it and the Mexican growers "that all duties were ultimately the responsibility of the Mexican producers," Inn Foods "had nothing to gain by this undervaluation of merchandise and the resulting underpayment of duties."  Def.'s Br. at 1, 8.  Inn Foods concedes that the prices it paid could increase in direct proportion to any increase in duty payments borne by the growers, but dismisses this

as a motivation because it claims the resulting impact of an additional $624,000 in duties would have been "statistically negligible, representing less than 3 percent of its gross profits during the relevant years." Id. at 8-9. Ignoring the fact that it is not obvious to this Court that three percent of gross profits should be considered a statistically negligible sum, this line of argument is hardly convincing. There are many reasons, including those brought out at trial by the United States, in addition to seeking to avoid an increase in prices, for why Inn Foods might have chosen to participate in this undervaluation scheme.[16] See Trial Tr. vol. 2, 225-27; Feb. 22, 2007.

**(ii) The legal duty to state that the entry was provisional**

Inn Foods argues that there was no evidence adduced at trial that indicates that "Inn Foods knew or understood the legal effect of post-importation price adjustments to the price actually paid or payable to the grower/packers based on the U.S. resale prices." Def.'s Br. at 8. This argument needlessly confuses the crux of the wrongdoing, which is that Inn Foods knew that (1) the prices on the subject entries were significantly undervalued, (2) these

---

[16] Moreover, as there is no requirement under 19 U.S.C. § 1592(a)(1) that there be a monetary gain, Inn Foods' statistically negligible sum argument is without merit.

undervaluations caused a commensurate reduction in lawful Customs duties owed and (3) there was no plan or intention to correct these undervaluations. Before the April 17, 1989 B&D letter, Inn Foods had never informed their Broker, B&D, of the provisional nature of their sales agreements with the Mexican growers (see Trial Tr. vol. 3, 351-53, Feb. 23, 2007), or that the prices of the entry documents were in any way provisional.[17] See Trial Tr. vol. 3, 356-57, Feb. 23, 2007.

Therefore, while Inn Foods correctly states that "there is nothing sinister, per se, about provisional pricing agreements," it is not the provisional pricing agreement here that is at issue, but the underlying undervaluation scheme in which the provisional pricing agreements only play a part. Def.'s Br. at 9.

The provisional pricing agreements at the heart of these transactions are used by Inn Foods as an ex post facto rationalization to conceal a relatively straight forward undervaluation scheme. It is telling that Inn Foods has not put

---

[17] Inn Foods argues in its post-trial brief that had it been "cognizant of an undervaluation scheme. . . it likely would not have prepared numerous written agreements with the Mexican growers evidencing the provisional nature of the prices." Def.'s Br. at 8. The fact that contracts were entered into between Inn Foods and Seaveg and the Mexican growers cannot be read as any evidence of the absence of such an undervaluation scheme, especially considering that the provisional nature of these contracts was kept a secret for so long.

forward any evidence that would show that before the Customs investigation they ever planned to address the factura undervaluations. It is also telling that Inn Foods has not put forward any evidence as to how the factura values were calculated, in order to show some connection, for instance, between that initial value and the "prices actually paid for the merchandise after certain post-importation price adjustments were made based on the final U.S. selling prices."[18] Def.'s Br. at 6. As it stands, it is clear that the factura values were determined by roughly halving the true value of the merchandise and that Inn Foods knowingly deprived Customs of duties for years without any intention to alert Customs that it was owed more in such duties or to rectify the undervaluation. As stated earlier, Inn Foods only excuse, that of ignorance and naivete, is belied by the facts.

### (iii) Statute of limitations

There is no merit to Inn Foods' revised statute of limitations argument raised in its post-trial brief.

All other arguments raised by Inn Foods are unpersuasive.

---

[18] Inn Foods attached a letter to entries submitted on or around April 17, 1989, to alert Customs at entry that the transaction values were provisional. This action was only taken by Inn Foods after they had been informed that Customs had referred their case for investigation.

### D.    Assessment of Penalties

Customs seeks $624,602.55 for unpaid duties and merchandise processing fees and civil penalties in the amount of $15,319,513.35 if Inn Foods' conduct is found to be fraudulent; $2,543,800.64 if Inn Foods is found grossly negligent; or $1,271,900.32 if Inn Foods is found  negligent; in each case plus interest, costs, and fees.[19] See Compl. ¶¶ 24, 27, 30.

For violations of fraud under 19 U.S.C. § 1592(a), the maximum penalty is the domestic value of the merchandise (see 19 U.S.C. § 1592(c)(1); see also 19 C.F.R. § 162.73(a)(1)), in this case $15,319,513.35. See supra. The plain language of the statute only sets maximum penalties and does not establish minimum penalties, nor does it require the Court to begin with the maximum and reduce that amount in light of mitigating factors. See United States v. Modes, Inc., 17 CIT 627, 635, 826 F. Supp. 504, 512 (1993). The Court "possesses the discretion to determine a penalty within the parameters set by the statute." Modes, 17 CIT at 636, 826 F. Supp. at 512 (citations omitted).

In United States v. Complex Machine Works Co., 23 CIT 942, 949-50, 83 F. Supp. 2d 1307, 1315 (1999)(citation omitted), this Court identified a number of factors to be considered when assessing

---

[19]    Pre-judgment interest should be computed from the time of the product liquidation.

a penalty:

1.  The defendant's good faith effort to comply with the statute,

2.  The defendant's degree of culpability,

3.  The defendant's history of previous violations,

4.  The nature of the public interest in ensuring compliance with the regulations involved,

5.  The nature and circumstances of the violation at issue,

6.  The gravity of the violation,

7.  The defendant's ability to pay,

8.  The appropriateness of the size of the penalty to the defendant's business and the effect of a penalty on the defendant's ability to continue doing business,

9.  That the penalty not otherwise be shocking to the conscience of the Court,

10. The economic benefit gained by the defendant through the violation,

11. The degree of harm to the public,

12. The value of vindicating the agency authority,

13. Whether the party sought to be protected by the statute had been adequately compensated for the harm, and

14. Such other matters as justice may require.

As this Court has noted, and as the United States has pointed out in their post-trial brief, "§1592 is driven primarily by considerations of deterrence rather than compensation." Complex Machine Works Co., 23 CIT at 950, 83 F. Supp. 2d at 1315. Accordingly, the Court takes into account that the conduct in question occurred many years ago and appreciates Inn Foods' argument, uncontradicted by the United States, that it has since the period in question corrected its past practices, and has "unfailingly reported the proper Customs value on its imported merchandise . . . without further incident." Def.'s Br. at 27.

After careful consideration of the Complex Machine Works factors, the evidence and the testimony presented at trial, the Court has determined that the penalty imposed upon Inn Foods must be a substantial one, but imposing the maximum penalty under fraud for the sake of deterring Inn Foods from future transgressions would not appear to be necessary. Based on the foregoing analysis, the Court determines that seven million, five hundred thousand dollars ($7,500,000.00) represents a just penalty in this case.

## CONCLUSION

In accordance with the foregoing the Court finds that Customs

has shown by clear and convincing evidence that Inn Foods' entry into the United States of the merchandise subject to this action constituted fraud in violation of 19 U.S.C. § 1592.

The Court orders that Inn Foods pay $624,602.55 for unpaid duties plus pre-judgment and post-judgment interest, and civil penalties in the amount of $7,500,000.00, plus costs and fees and interest from the date of judgment. Judgment shall enter accordingly.

/s/ Nicholas Tsoucalas
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated: September 25, 2007
      New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                        :
UNITED STATES,                          :
                                        :
    Plaintiff,      :
                                        :
    v.               :   Court No. 01-01106
                                        :
INN FOODS, INC.,                        :
                                        :
    Defendant.       :
_____ :

### JUDGMENT

    This case having been heard at trial <u>de novo</u> and submitted for decision, and the Court, after due deliberation, having rendered a decision therein; now, in accordance with said decision, it is hereby

    **ORDERED, ADJUDGED, AND DECREED** that a judgment be, and hereby is, entered in favor of Plaintiff, United States, and against Defendant, Inn Foods, Inc. ("Inn Foods") in accordance with the Findings of Fact and Conclusions of Law issued contemporaneously herewith; and it is further

    **ORDERED, ADJUDGED, AND DECREED** that Plaintiff shall recover unpaid duties from Inn Foods in the amount of $624,602.55 plus pre-judgment and post-judgment interest; and it is further

    **ORDERED, ADJUDGED, AND DECREED** that Plaintiff shall recover against Inn Foods an assessed civil penalty in the amount of $7,500,000.00, plus costs and fees and interest from the date of judgment, for fraud in violation of 19 U.S.C. § 1592.


                                              /s/ Nicholas Tsoucalas
                                              NICHOLAS TSOUCALAS
                                                    SENIOR JUDGE


Dated:     September 25, 2007
            New York, New York