# United States Court of Appeals for the Federal Circuit

2008- 1118

UNITED STATES,

Plaintiff-Appellee,

v.

INN FOODS, INC.,

Defendant-Appellant.

John M. Peterson, Neville Peterson LLP, of New York, New York, argued for plaintiff-appellee. With him on the brief were Maria E. Celis, Michael T. Cone; and George W. Thompson, of Washington, DC. Of counsel on the brief were Robert Scott Whiteley, Law Offices of Robert Scott Whiteley, of Oakland, California; and Craig A. Mitchell, Whitley & Cooper of Berkeley, California.

David S. Silverbrand, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. On the brief were Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and J. Reid Prouty, Trial Attorney.

Appealed from: United States Court of International Trade

Senior Judge Nicholas Tsoucalas

# United States Court of Appeals for the Federal Circuit

2008-1118

UNITED STATES,

Plaintiff-Appellee,

v.

INN FOODS, INC.,

Defendant-Appellant.

Appeal from the United States Court of International Trade in case no. 01-01106, Senior Judge Nicholas Tsoucalas.

_____

DECIDED: March 27, 2009

_____

Before RADER, BRYSON, and DYK, Circuit Judges.

DYK, Circuit Judge.

The United States brought suit against Inn Foods, Inc. ("Inn Foods") to recover unpaid customs duties and civil penalties for the fraudulent entry of frozen vegetables by Inn Foods and its sister company, SeaVeg, Ltd. ("SeaVeg"). Following a bench trial, the Court of International Trade held that Inn Foods was liable for monetary penalties under 19 U.S.C. § 1592(a) and for unpaid duties under § 1592(d).[1] United States v. Inn Foods, Inc., 515 F. Supp. 2d 1347 (Ct. Int'l Trade 2007). We affirm.

---

[1] Citations to 19 U.S.C. § 1592 are to the 1988 version unless otherwise noted.

BACKGROUND

This is the second time this case has come before us. We previously held that the statute of limitations did not preclude the government's suit against Inn Foods. United States v. Inn Foods, Inc., 383 F.3d 1319, 1320 (Fed. Cir. 2004). The relevant facts leading to this appeal are as follows.

Inn Foods, a California company established in the late 1970s, imported frozen fruits and vegetables into the United States. SeaVeg, now defunct, was a Cayman Islands corporation founded and operated by the same individuals as Inn Foods. SeaVeg was formed to facilitate sales to customers who did not want to buy from Inn Foods. Though separate legal entities, Inn Foods and SeaVeg shared employees, were subsidiaries of the same parent company ("The VPS Companies, Inc."), operated from the same physical location, had the same telephone number, commingled accounting books, imported the same type of merchandise, and were interchangeably listed on contracts with suppliers. In addition, Inn Foods handled invoices for SeaVeg and issued checks for invoiced merchandise regardless of which company was the importer of record on a particular entry. Due to its potential liability for duties and civil monetary penalties, SeaVeg filed for Chapter 7 bankruptcy and was dissolved on December 1, 1998.

This action concerns the companies' entries of frozen produce from six Mexican growers between January 22, 1987, and January 19, 1990. Inn Foods candidly stipulated that "[t]he prices declared to Customs for the entries that are the subject of [this action] . . . were undervalued and did not reflect the prices actually paid to the six Mexican growers/packers." J.A. 101. The amount of the undervaluation was

approximately $3.5 million, resulting in a loss to the government of $624,602.55 in duty.[2]

The undervaluation of the entries stemmed from a double-invoicing system agreed upon by Inn Foods, SeaVeg, and the six Mexican growers. For each order of produce shipped, the Mexican growers would issue a "factura" or invoice to Inn Foods or SeaVeg containing a specific invoice number and description of produce. The factura, however, reflected neither the actual price to be paid to the grower by Inn Foods or SeaVeg nor the market value of the produce, but rather a substantially lower amount. The factura for each order was provided to the companies' customs brokers, B&D Customhouse Brokers Inc. ("B&D") and Achilles Customs Broker, who used it to enter the shipment of produce into the United States.

Upon receipt of the factura from the Mexican growers, Inn Foods would create a second invoice for the specific transaction and send it to the grower as an order confirmation. That second invoice would retain the original invoice number and produce description from the factura, but was revised to reflect the estimated market value of the produce, which was higher. Seventy percent of this higher invoiced amount was initially remitted to the Mexican grower. The balance, minus certain adjustments (such as customs duties, which were ultimately passed on to the Mexican growers) was remitted some months later after the final market price of the produce was determined.[3]

---

[2]     The parties agree that the true value of the frozen produce entered during the relevant period was approximately $15.3 million, of which Inn Foods was the importer of record or consignee of $4.4 million and SeaVeg of $10.9 million. After properly excludable costs, the dutiable value of the entries was approximately $11.8 million. Inn Foods and SeaVeg, however, declared a value of only $8.3 million.

[3]     There is no contention that the use of provisional pricing itself is necessarily improper. See 19 U.S.C. §§ 1401(s), 1484(b) (2006) (discussing

In 1988, United States Customs and Border Protection ("Customs") began examining Inn Foods and SeaVeg entries. In July and October of that year, Customs made formal requests for documentation of the payments to the growers for each subject entry. No response was made, and after a third formal request in March 1989, Customs obtained records indicating that the amount paid to the Mexican growers for the subject entries was much higher than the facturas that had been presented to Customs. On April 10, 1989, Customs informed Inn Foods that the case was being referred for formal investigation. That investigation began in June.

Beginning on April 17, 1989, after receiving notice of the referral for investigation, Inn Foods began including a disclaimer on entries from the Mexican growers. This disclaimer is further discussed below.

On December 14, 2001, the government filed suit against Inn Foods under 19 U.S.C. § 1592, contending that the company had unlawfully deprived the government of duties through the fraudulent use of false importation documents.[4] Although Inn Foods

---

"reconciliation" process by which information not fully known at the time of entry may be flagged and subsequently transmitted to Customs).

[4] The subject entries span the 1982 and 1988 versions of 19 U.S.C. § 1592, which do not differ materially. Section 1592(a)(1) (1988) provides in relevant part:

> [N]o person, by fraud, gross negligence, or negligence—
>> (A) may enter . . . any merchandise into the commerce of the United States by means of—
>>> (i) any document, written or oral statement, or act which is material and false, or
>>> (ii) any omission which is material, or
>> (B) may aid or abet any other person to violate subparagraph (A).

Section 1592(c) provides monetary penalties for violations of § 1592(a), with the maximum penalty amount dependant on the level of culpable intent involved (fraud, gross negligence, or ordinary negligence). 19 U.S.C § 1592(c)(1)-(3) (1988).

had executed a series of two-year waivers of the relevant statute of limitations, the Court of International Trade held that the complaint was time-barred. United States v. Inn Foods, Inc., 264 F. Supp. 2d 1333, 1334 (Ct. Int'l Trade 2003). This court reversed. Inn Foods, 383 F.3d at 1320.

On remand, the trade court held a three-day bench trial where ten witnesses were heard. On September 25, 2007, the trade court ruled against Inn Foods. First, the court determined that the government had shown by clear and convincing evidence that the facturas used to enter the produce were material and false, and that Inn Foods acted with intent to defraud. Inn Foods, 515 F. Supp. 2d at 1357-59. The trade court determined that in addition to violating § 1592(a) with its own fraudulent entries, Inn Foods also aided and abetted SeaVeg's violations. Id. at 1357 ("[T]he Inn Foods corporate entity itself was involved . . . in the [SeaVeg] transactions that are at issue . . . ."). Second, the court determined that the appropriate civil monetary penalty under 19 U.S.C. § 1592(c)(1) was approximately $7.5 million, and that the amount of unpaid duty owed to the government under 19 U.S.C. § 1592(d) was $624,602.55. Inn Foods, 515 F. Supp. 2d at 1361-62. Finally, the court concluded that Inn Foods was liable for the entire amount, either as an alter ego of SeaVeg or as an aider and abettor. Id. at 1357.

Inn Foods timely appealed from the final judgment of the Court of International Trade, and we have jurisdiction under 28 U.S.C. § 1295(a)(5). We review questions of law de novo and the Court of International Trade's factual findings for clear error. United States v. Ford Motor Co., 463 F.3d 1267, 1274 (Fed. Cir. 2006); United States v. Hitachi Am., Ltd., 172 F.3d 1319, 1326 (Fed. Cir. 1999).

DISCUSSION

I

On appeal, Inn Foods does not seriously dispute that it violated 19 U.S.C. § 1592(a) by entering its own merchandise and aiding and abetting SeaVeg's entry of its merchandise by use of documents that were material and false, nor could it plausibly do so.[5] In other words, Inn Foods does not dispute the trade court's finding that "Inn Foods was a participant on some level in all the SeaVeg actions discussed herein." Inn Foods, 515 F. Supp. 2d at 1353. Instead, Inn Foods primarily contends that the trade court erred in finding that Inn Foods acted with fraudulent intent, as opposed to merely acting negligently. In this context, showing the requisite fraudulent intent required the government to prove by clear and convincing evidence that Inn Foods "knowingly entered goods by means of a material false statement." Hitachi, 172 F.3d at 1326 (internal quotation marks omitted); see 19 U.S.C. § 1592(e)(2). The record amply supports the trade court's factual finding that the government established such intent.

Initially we note that the record fully supports the trade court's determination that Inn Foods knew that the invoice for each shipment of produce was grossly undervalued, and hence false. The Mexican grower sent Inn Foods a copy of the undervalued factura

---

[5] Inn Foods does attempt to explain the undervaluation by arguing that "the 'second invoice' was, in fact, a 'Sales Memo' showing the anticipated U.S. resale price, not the price paid or agreed to be paid for the imported merchandise." Def.-Appellant's Br. 4. Inn Foods admits that its sales agreements with the Mexican growers called for an initial payment of 70% of the estimated value of the produce. The record shows that the prices Inn Foods actually reported to Customs for its entries were considerably lower than even the 70% figure; testimony at trial indicated that Inn Foods declared values as low as 40-50% of the true price for some entries. We see no error in the trade court's rejection of this argument as an "ex post facto rationalization." Inn Foods, 515 F. Supp. 2d at 1360.

invoice; that factura invoice was used to value the entries for Customs purposes.[6] There was evidence that the growers specifically informed Inn Foods of the undervaluation. As the trade court noted, for example, a letter addressed to SeaVeg from one of the Mexican growers stated that "[w]e ship . . . Broccoli Spears at 0.50/lb" but that "[m]y invoice [to SeaVeg] will read . . . 0.28/lb." Inn Foods, 515 F. Supp. 2d at 1354 n.12 (emphases added). Moreover, upon receipt of the undervalued factura, a SeaVeg manager (who reported to the principals of Inn Foods) adjusted the prices to reflect the true and higher estimate.[7] This higher amount was entered into Inn Foods's accounting system. Inn Foods then sent an order confirmation to the Mexican grower with the higher price, retaining a copy of both the undervalued and true invoices for its files. Thus, "[o]ne invoice served to bring the produce into the United States at a reduced cost and . . . the second to keep accurate accounting records." Inn Foods, 515 F. Supp. 2d at 1359. Inferring fraudulent intent from the knowing use of false invoices is hardly unique to the customs context. As the First Circuit has noted in an analogous area, "[t]he use of false invoices is so paradigmatic of tax fraud that the Supreme Court listed it among the classic indicia from which a willful intent to defeat or evade taxes might be inferred." United States v. Marek, 548 F.3d 147, 151-52 (1st Cir. 2008) (citing Spies v. United States, 317 U.S. 492, 499 (1943)).

---

[6] The method of appraisement reported to Customs appears to have been transaction value (the amount paid by the importer for the merchandise to be imported). See 19 U.S.C. § 1401a(b).

[7] To be sure, the true invoice was an estimate and was subject to certain adjustments when the final market price was determined, but the parties treated it as a reliable estimate of the value of the produce and used it to make the initial 70% payment.

The existence of the double invoices was also concealed. One broker called the SeaVeg manager to verify that the unusually low invoice prices for the subject entries were accurate. The company responded to this inquiry by stating that the prices were correct, and that the company had simply obtained the produce at a good price. Despite these questions, at no point before the Customs investigation began in 1989 did Inn Foods inform the brokers of the double-invoicing system. Likewise, during the initial Customs investigation, Inn Foods's accounting supervisor—"with what must have been full knowledge of the falsity of the statement"—denied outright the existence of a second invoice reflecting a price higher than the amount reported to Customs. Inn Foods, 545 F. Supp. 2d at 1359 n.15. This concealment, too, points strongly to fraudulent intent.

The record also makes clear, and Inn Foods does not contest, that Inn Foods knew the false invoices would be used to enter goods into the United States.

Finally, the record fully supports the trade court's finding that Inn Foods knew that the false invoices were material. The evidence shows that Inn Foods's customs brokers emphasized to the company the importance of accurately reporting the actual value of entered merchandise; one broker, for example, explained to SeaVeg's manager in detail how Customs duties were determined. In addition, after each entry was made and duties paid, B&D would send a broker bill to Inn Foods which included an itemization of costs, including a copy of the undervalued factura that had been presented to Customs and the duties paid based on that factura. The Inn Foods/SeaVeg accounting supervisor or her assistant would review each broker bill and thus knew how much duty had been paid based on the values declared by Inn Foods. Having been founded in the 1970s, Inn Foods cannot plausibly claim that in 1987 it was

a still novice importer that did not understand after reviewing its broker bills that the amount of value declared was material to the ad valorem duties paid. The fact that the growers may ultimately have been liable for the duties under the sales agreements with Inn Foods / SeaVeg does not defeat a finding of materiality.

In sum, we agree that the evidence supports the trade court's finding of fraudulent intent with regard to the basic double-invoicing scheme.

However, Inn Food contends that even if fraud was established concerning its entries before April 17, 1989, "the inclusion of the disclaimers in entry documents belies any possibility that intent to defraud existed as to those entries containing the statements" after that date. Def.-Appellant's Br. 48. Thus, Inn Foods argues, the trade court's finding of fraud was clearly erroneous with regard to the entries bearing that disclaimer.[8]

We disagree. The disclaimer was as follows:

[T]he value being used on shipments of frozen vegetables entered as of April 10, 1989 is strictly for customs clearance.

Liquidation of said entries is to be withheld until the importer of record, SeaVeg, Ltd./Inn Foods, Inc., is able to complete the audit of their files and arrive at a true transaction value.

As soon as we receive any information, we will advise you.

J.A. 124. At the outset, we note that the original fraudulent scheme of submitting undervalued invoices continued unabated after April 17, 1989. The inclusion of a

---

[8] The Court of International Trade acknowledged the disclaimer but did not find that it merited detailed discussion, noting that Inn Foods began use of the disclaimer "only . . . after they had been informed that Customs had referred their case for investigation." Inn Foods, 515 F. Supp. 2d at 1361 n.18; see also id. at 1355.

disclaimer after Inn Foods learned of the Customs investigation is itself evidence of an intent to conceal fraud.

This is particularly evident in light of the language of the disclaimer. First, the statement that the value declared was "strictly for customs clearance" (combined with the statement that SeaVeg and Inn Foods were determining the "true transaction value") suggested that the invoices contained a mere calculational error or inaccuracy. As we have discussed, the trade court found that the invoices were not merely inaccurate; they were deliberately false. The suggestion in the disclaimer that the invoices were merely inaccurate, rather than deliberately false, was itself knowingly false.

Second, the disclaimer suggested that an "audit" was underway by Inn Foods and that it was necessary to determine the true values. The trade court, however, found specifically that "Inn Foods maintained both the undervalued Mexican growers' invoices and the adjusted Inn Food[s] generated invoices in their accounting files." Inn Foods, 515 F. Supp. 2d at 1354. Inn Foods already had in its possession both the true invoices and the false invoices that had been provided to Customs. No audit was required for Inn Foods to determine that the declared values were incorrect; also the record contains no evidence that an audit was actually commenced.

Third, the disclaimer implied that Inn Foods was working to correct the error, and would "advise" Customs as soon as that happened. It is undisputed that no corrections were ever made; at no point did Inn Foods file amended entries despite continuing to submit invoices that it knew were deliberately false. The failure to act to correct the falsely documented entries supports the trade court's inference that Inn Foods had "no plan or intention to correct these undervaluations." Inn Foods, 515 F. Supp. 2d at 1360;

see, e.g., United States v. Pimental, 380 F.3d 575, 588-89 (1st Cir. 2004) (where defendant received insurance document reflecting defendant's falsification but "chose not to correct the misinformation" he had provided to insurance company, reasonable jury could infer that failure to correct was "perpetuating the fraud and demonstrating further his fraudulent intent").[9]

We conclude that the trade court's finding of fraudulent intent as to the invoices bearing the disclaimer is not clearly erroneous. We affirm the Court of International Trade's determination that Inn Foods is liable under § 1592(a).

II

We turn next to the question of liability for the $624,602.55 in unpaid duty under § 1592(d). Section 1592(d) requires collection of any duty unpaid as a result of a violation of § 1592(a), providing:

> (d) Deprivation of lawful duties
>
> Notwithstanding section 1514 of this title, if the United States has been deprived of lawful duties as a result of a violation of subsection (a) of this section, the appropriate customs officer shall require that such lawful duties be restored, whether or not a monetary penalty is assessed.

19 U.S.C. § 1592(d) (1988); accord 19 U.S.C. § 1592(d) (1982) (same).

Inn Foods concedes that under § 1592(a), which by its plain terms reaches one who seeks to "aid or abet" a violation of that section, Inn Foods could be liable for the entire amount of the $7.5 million civil monetary penalty imposed by the Court of International Trade. Def.-Appellant's Br. 19 ("Customs is authorized to impose civil

---

[9] Nor are we persuaded by Inn Foods's similar contention that its belated letter to Customs, dated July 19, 1989, indicated that it did not act with fraudulent intent. The vaguely worded letter, which attempted to lay the blame for the false invoices on the Mexican growers and came months after Inn Foods had already been informed that it would be investigated, can hardly be said to preclude a finding of fraud.

penalties not only on importers of record, but on <u>any person</u> involved in the violation, including persons who aid and abet such violations."); <u>see</u> 19 U.S.C. § 1592(a)(1)(B).

Inn Foods contends, however, that the trade court erred in holding that it was similarly liable under § 1592(d) for the entire $624,602.55 in unpaid duty on the subject entries, including the portion attributable to entries for which SeaVeg was the importer of record. The trade court held that Inn Foods was liable for the entire amount under two separate theories: (1) because subsection (d) imposes liability for duty on aiders and abettors, and (2) because SeaVeg was actually the alter ego of Inn Foods. There is considerable merit to each of these theories, but we need only address the first because we conclude that the trade court correctly construed the statute.

Inn Foods argues that Congress intended duties to be collectable under subsection (d) only from those parties who otherwise would have had to pay the duty on an entry—the importer of record or the importer's surety—and that "[n]othing in [§ 1592(d)] or any other Customs law authorizes the [Court of International Trade] to impose on any person vicarious liability for import duties owed by another." Def.-Appellant's Br. 13-14.

Inn Foods is correct that normally only importers of record and their sureties are liable for duty. <u>See generally</u> 19 U.S.C. §§ 1484-85 (requiring importer of record or agent to make entry of merchandise to allow assessment of duty); <u>United States v. Blum</u>, 858 F.2d 1566, 1570 (Fed. Cir. 1988) (identifying importers of record and sureties as the parties "traditionally liable" for payment of duty). However, the language and structure of § 1592 indicates that subsection (d) is not limited to only importers and their

sureties, but is intended to apply to further the mandatory recovery of unpaid duty from any party liable under subsection (a).

Subsection (d) states broadly that when any duty is lost "as a result of a violation of subsection (a) . . ., [Customs] shall require that such lawful duties be restored," without limiting what party must pay that duty or limiting recovery to any particular type of violation of (a).  19 U.S.C. § 1592(d).  This suggests that the party liable for penalties under (a) would also be liable under (d) for the lost duty.  The use of the word "restored" does not suggest that only parties originally liable for payment of duty are subject to subsection (d); rather, the use of the word "restored" suggests that the forgone duty is to be "restored" to the United States.  Where Congress intends a provision of the Tariff Act to apply only to the importer, it says so explicitly.  See, e.g., 19 U.S.C. § 1484 (referring specifically to the "importer of record"); id. § 1485 (same); id. § 1505 (same); see also Hitachi, 172 F.3d at 1336 (non-importer defendant could be liable under § 1592(a)(1)(B) as an aider and abettor, but not under §§ 1484-85 directly because those sections "apply by their terms only to importers of record").

The clear purpose of the statute as well supports a broad reading.  It seems inherently improbable that the statute was intended to allow a party (such as Inn Foods) that deprives the government of revenue by aiding and abetting another's fraudulent entry of merchandise to be subject to penalties, yet bear no responsibility under § 1592(d) to make the United States whole by paying the duty lost as a result of that fraud.

The legislative history of § 1592(d) is in accord with the clear language of the provision.   Subsection (d) was added by the Customs Procedural Reform &

Simplification Act of 1978, Pub. L. No. 95-410, § 110, 92 Stat. 888, 896. The act was designed to change § 592 of the Tariff Act of 1930. Former § 592, like § 1592, imposed penalties for the use of material false statements to unlawfully enter goods into the United States, or "aid[ing] or procur[ing]" such statements.[10]

In large part the revision of § 592 was driven by Congress's desire to ameliorate the provision's unduly harsh mandatory penalty. Before the 1978 amendment, a person who entered merchandise by means of a false statement and one who "aid[ed] or procure[d]" such a false statement was required to forfeit the entire value of the merchandise. See, e.g., H.R. Rep. No. 95-621, at 2-3 (1977) (House Ways and Means committee report detailing same); see also 19 U.S.C. § 1592 (1976). While Customs had discretion under § 618 of the Act (19 U.S.C. § 1618 (1976)) to mitigate the penalty, even negligent violations of the statute resulting in trivial losses of duty gave rise to enormous potential liability. The administrative practice of Customs at the time was to offer a more reasonable mitigated penalty under 19 U.S.C. § 1618 that limited the penalty to the unpaid duty plus an additional amount reflecting the violator's particular culpability. See, e.g., Hearings Before the Subcomm. on Trade of the Comm. on Ways & Means, 95th Cong. 95-31 (1977) (Memorandum to the Committee on Ways and

---

[10]    Former § 592 provided, in relevant part,

> If any . . . person or persons enters or introduces . . . into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice . . . or by means of any false statement, . . . or aids or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, . . . such merchandise, or the value thereof, to be recovered from such person or persons, shall be subject to forfeiture . . . .

19 U.S.C. § 1592 (1976).

Means of the House of Representatives, from the International Trade Commission, stating that the "current practice is to mitigate on the basis of the degree of culpability" so that "the penalty usually represents an increment of the loss of revenue").

The revision to § 592 eliminated mandatory minimum penalties, setting instead different maximum penalties for violations resulting from fraud, gross negligence, and negligence. Pub. L. No. 95-410, § 110, 92 Stat. at 894-95; see 19 U.S.C. § 1592(c).[11] But Congress clearly intended to also require full payment of the duty, as Customs had routinely done under the previous statute. The committee report accompanying the House bill notes that § 1592(d) was intended to "codify the existing administrative

---

[11]    Section 1592(c) of Title 19 (1988) provides, in relevant part:

(c) Maximum penalties

  (1) Fraud
        A fraudulent violation of subsection (a) of this section is punishable by a civil penalty in an amount not to exceed the domestic value of the merchandise.

  (2) Gross negligence
        A grossly negligent violation of subsection (a) of this section is punishable by a civil penalty in an amount not to exceed—
              (A) the lesser of—
                    (i) the domestic value of the merchandise, or
                    (ii) four times the lawful duties of which the United States is or may be deprived, or
              (B) if the violation did not affect the assessment of duties, 40 percent of the dutiable value of the merchandise.

  (3) Negligence
        A negligent violation of subsection (a) of this section is punishable by a civil penalty in an amount not to exceed—
              (A) the lesser of—
                    (i) the domestic value of the merchandise, or
                    (ii) two times the lawful duties of which the United States is or may be deprived, or
              (B) if the violation did not affect the assessment of duties, 20 percent of the dutiable value of the merchandise.

practice of mitigating claims for forfeiture value <u>on condition that any loss of revenue is</u> <u>[paid]</u>. This covers cases where Customs may not wish to assess a penalty" but duty is still lost. H.R. Rep. No. 95-621, at 16 (emphasis added); <u>see also, e.g.</u>, <u>Siaca v. United States</u>, 754 F.2d 988, 990 (Fed. Cir. 1985) (describing mitigation of penalty under § 1618 on condition that proper duty be paid). In fact, in § 1592(c) Congress expressly provided that even those subject to reduced penalties for a violation of § 1592(a) (by making disclosure before an investigation is commenced) would not escape payment of duties, regardless of the degree of culpability involved. <u>See</u> 19 U.S.C. § 1592(c)(4). The history of subsection (d) is consistent with the view that Congress intended to continue to impose liability for unpaid duty on any party guilty of fraud or aiding and abetting fraud.

Finally, Inn Foods contends that our decision in <u>United States v. Blum</u>, 858 F.2d 1566 (Fed. Cir. 1988), adopted Inn Foods's construction of the statute. We disagree. In <u>Blum</u>, Blum (the president of a foreign company) improperly caused orange juice concentrate to be entered into the United States without proper payment of duties. <u>Id.</u> at 1567. The government subsequently brought an action under § 1592(a) for civil penalties against Blum, and for unpaid duties under § 1592(d) against Blum, McAfee (the importer of record), and St. Paul (the surety for McAfee). <u>Id.</u> at 1567-68. McAfee and St. Paul were not implicated in Blum's wrongdoing under § 1592(a) and argued that as "innocent parties" they could not be liable for unpaid import duties under subsection (d). <u>Id.</u> at 1569.

We rejected this argument, holding that subsection (d) is broader than subsection (a), covering not only those who participated in the fraud but also those traditionally liable for payment of duty:

> Subsection (d) is not a penalty provision; rather, subsection (d) allows the United States to recover lawful duties lost as a result of a violation of subsection (a). Lawful duties are those that would have been collected by the United States but for the violation of subsection (a). We interpret the authority of the United States to seek lost import duties under subsection (d) as not limited to those parties that have violated subsection (a) but as extending to those parties who may have been deemed responsible for the lawful duties had such duties lawfully been imposed.

Id. at 1569 (emphasis added).

The clear implication of our statement—that subsection (d) is "not limited to those parties that have violated subsection (a)"—is that subsection (d) includes parties who have violated subsection (a). Inn Foods's argument finds no support in Blum.[12]

Because we conclude that § 1592(d) imposes liability for unpaid duty upon those who knowingly aid and abet violations of § 1592(a), thereby depriving the government of revenue, we affirm the holding of the Court of International Trade that Inn Foods is liable for the entire amount of unpaid duty on the subject entries. We do not reach Inn Foods's arguments concerning the trade court's alternative holding that Inn Foods was liable for SeaVeg's share of the unpaid duties as SeaVeg's alter ego.

### III

Inn Foods raises two additional points. First, Inn Foods contends that the Court of International Trade abused its discretion by "fail[ing] to provide a discussion of the

---

[12]    The fact that subsection (d) does not impose a "penalty," see Blum, 858 F.3d at 1569; United States v. Jac Natori Co., 108 F.3d 295, 299 (Fed. Cir. 1997), does not argue against requiring aiders and abettors to make a compensatory payment of duty.

specific factors" that led it to impose a monetary penalty in the amount of $7.5 million dollars due to Inn Foods's fraudulent violation of 19 U.S.C. § 1592(a). Def.-Appellant's Br. 54. Inn Foods contends that "[t]he [Court of International Trade]'s failure to provide an explanation of [the factors it considered] . . . deprives this Court of the ability to review whether the evaluation of the factors was reasonable or showed an error of judgment." Id. at 56.

We disagree with Inn Foods's characterization of the trade court's opinion. Where the legislature delegates to a trial court the discretion to determine the amount of a monetary award, we will overturn an exercise of that discretion only where it is "clearly unreasonable, arbitrary, or fanciful, based upon an erroneous construction of the law, based upon fact findings that are clearly erroneous," or completely unsupported by the record. Ford Motor Co., 463 F.3d at 1285 (quotation marks omitted). The court's reasoning concerning its determination of the appropriate monetary penalty in this case, while not elaborate, is sufficient to permit a meaningful review of its exercise of discretion against this standard.

Specifically, the trade court noted that the statute set a maximum penalty of the domestic value of the merchandise, here approximately $15 million, but set no minimum. Inn Foods, 515 F. Supp. 2d at 1361. Further, the court indicated that in determining a penalty it had carefully considered the factors previously set forth in United States v. Complex Machine Works Co., 83 F. Supp. 2d 1307, 1315 (Ct. Int'l

Trade 1999).[13]  Several portions of the trade court's opinion and factual findings, while not expressly repeated in the section of the opinion dealing with monetary penalties, support its conclusion "that the penalty imposed upon Inn Foods must be a substantial one" under these factors.  Inn Foods, 515 F. Supp. 2d at 1362.  For instance, with relevance to factor (1), the court determined that during the relevant time period Inn Foods's actions were fraudulent and rejected Inn Foods's protestation that it made a good-faith effort to comply with the statute, id. at 1358-59; with relevance to factors (2) and (5), it determined that Inn Foods's knowingly fraudulent conduct went on for years, id. at 1361; and with relevance to factors (9), (10), and (11), it found that the amount of duty lost was a substantial sum, id. at 1361.

The court also explained that several factors counseled against imposition of a larger penalty.  It noted that the conduct in question took place many years ago, that Inn Foods had corrected its past practices, and that the company has since unfailingly reported the proper dutiable value of imported merchandise.  Id. at 1362.  Because the offense was serious and culpable, but the maximum penalty was unlikely to be necessary to deter future violations by Inn Foods, the trade court determined that $7.5

---

[13]  The trade court identified numerous factors: the defendant's (1) good faith effort to comply with the statute, (2) degree of culpability, and (3) history of previous violations; the nature of (4) the public interest in ensuring compliance with the regulations involved and (5) the violation at issue; (6) the gravity of the violation; (7) the defendant's ability to pay; (8) the appropriateness of the size of the penalty to the defendant's business and ability to continue doing business; (9) that the penalty not otherwise be shocking to the conscience of the Court; (10) the economic benefit gained by the defendant; (11) the degree of harm to the public; (12) the value of vindicating agency authority; (13) whether the party sought to be protected by the statute had been adequately compensated for the harm; and (14) other matters as justice may require. Inn Foods, 515 F. Supp. 2d at 1361-62.

million (or approximately half of the value of the imported goods) was a just penalty. We cannot say that the court abused its discretion in making this determination.

Second, Inn Foods argues that the 1993 amendment of the limitations period in 19 U.S.C. § 1621 serves "to truncate Inn Foods' duty liability for merchandise imported prior to December 8, 1988." Def.-Appellant's Br. 57. This argument is without merit. As we have previously noted, Inn Foods repeatedly agreed to waive the statute of limitations for successive two-year periods, and it did so after the 1993 amendment. Inn Foods, 383 F.3d at 1320. The final waiver before this action was commenced provided:

> Inn Foods, Inc. hereby waives the period of limitations contained in Title 19, United States Code, Section 1621, and any other applicable statute(s) of limitations with respect to Customs entries of frozen fruits and vegetables, filed with the U.S. Customs during the period from May 1, 1986 through December 31, 1990, for a period of TWO YEARS, commencing on December 14, 1999. Inn Foods, Inc. agrees that it will not assert any statutes of limitation defense in any action brought by the United States Government concerning the entries designated above with respect to the TWO-YEAR PERIOD for which the statute of limitation is hereby waived.

(emphases added). In the face of this unambiguous waiver of any statute-of-limitations defense, the trade court correctly rejected Inn Foods's argument. Inn Foods, 515 F. Supp. 2d at 1361.

## CONCLUSION

In conclusion, we sustain the Court of International Trade's determination that Inn Foods fraudulently entered and knowingly aided and abetted the fraudulent entry of merchandise in contravention of 19 U.S.C. § 1592(a), and that it is also liable under 19 U.S.C. § 1592(d) for unpaid duties.

## AFFIRMED

## COSTS

No costs.